[No. C010634. Third Dist. Dec. 28, 1992.]

NATIONAL IDENTIFICATION SYSTEMS, INC., Plaintiff and Appellant,
v.
STATE BOARD OF CONTROL, Defendant and Appellant;
DEPARTMENT OF GENERAL SERVICES et al., Real Parties in Interest
and Appellants.

**COUNSEL**

Whitman & Ransom, Mark S. Shipow, Ellen M. Bender and Rodney J. Blonien for Plaintiff and Appellant.

Catherine Close for Defendant and Appellant.

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Linda A. Cabatic, Cathy A. Christian and Ramon M. de la Guardia, Deputy Attorneys General, and Robert G. Holderness for Real Parties in Interest and Appellants.

**OPINION**

**NICHOLSON, J.**—The state awarded a contract to NBS Imaging Systems, Inc. (NBS) to provide an integrated data processing and card production

system for the Department of Motor Vehicles (DMV).[1] National Identification Systems, Inc. (NIS), a disappointed bidder, protested to the Board of Control (Board). After the Board dismissed the protest, NIS petitioned the superior court for a writ of administrative mandate against the Board. The superior court issued a writ ordering the Board to set aside its decision and reconsider part of it. All parties appeal. Finding no abuse of discretion in the Board's decision, we reverse the judgment of the superior court.

### FACTS AND PROCEDURAL HISTORY

On December 2, 1988, the Department of General Services (DGS) issued a request for proposal (RFP). The RFP sought bids on a system to digitally capture, store, and retrieve photographs, fingerprints, and data and produce plastic driver's licenses, salesperson's licenses, and identification cards for DMV. The successful bidder would provide these services at a cost-per-card price to DMV. To construct such a system, bidders were encouraged to select and combine hardware and software to best provide the services required by the RFP.

The bid process allowed bidders to get the input of the State at various times before bid submission. This communication permitted bidders to assure their bids were responsive to the RFP through testing and refinement. The benefit of this multistep process would be to maximize the number of responsive bids and thus give the State a broad range of possible solutions.

The first phase allowed bidders to discuss with the State the potential solutions and contract language. Bidders were allowed to propound written questions. Although bidders could discuss the questions with State officials, only written answers were binding. Each bidder was also allowed to submit detailed technical proposals, after which the State would meet with the bidder and discuss the proposals confidentially. However, only those understandings reached at the meetings and memorialized in a confidential memorandum were binding.

The second phase allowed bidders to submit draft proposals. The State reviewed these proposals to identify administrative defects and help bidders avoid submitting bids unresponsive to the RFP. The RFP allowed bidders to submit multiple bids including different solutions to the RFP's requirements. The final bids were due June 8, 1989.

During the first and second phases, bidders could submit samples of digitized photographs, fingerprints, and signatures; encoded magnetic

---

[1] "The State" refers to the Deparment of Motor Vehicles, the Department of General Services, and the Board of Control.

stripes; and blank cards with the required security features. The State would approve or reject samples submitted before May 2, 1989. Failure to gain approval of the features through this pretesting process did not preclude bidders from including the features in their final bids. Instead, the samples would be tested after bid submission but before the bid could be considered. If the samples did not pass the testing, the bid would not be evaluated further.

The RFP, which included the model contract, also provided for acceptance testing after award of the contract. As stated in the RFP, this testing was "intended to determine compliance of equipment and software with [the vendor's] published specifications and to determine the reliability of the equipment." If the vendor proved unable to comply with the contract within specified time limits, the State had the option to cancel all or part of the contract.

The State received seventeen final bids: nine from NBS; two each from NIS, Unisys, and Advanced Information Management Services, Inc.; and one each from Polaroid and Edicon. The bids were scored in a fair and impartial way, with a higher score indicating a better bid.

An NBS bid scored the highest in the bid evaluation. This bid proposed as a security feature use of a transparent hologram to cover the entire face of the cards. At a cost of $0.76853 per card, it provides the lowest total cost to the State over the life of the contract at $28,533,801.83. Two other NBS bids using a different security feature scored second and third in the evaluation. An NIS bid placed fourth in the evaluation scoring at a cost per card of $0.83330 and total minimum cost of $32,626,921.

Having scored the highest on the bid evaluation, NBS was invited to participate in the next step toward award of the contract: the benchmark demonstration. As we will discuss in more detail, the purpose of the benchmark demonstration was to determine whether the bidder could do the required work. NBS did not demonstrate all elements of a working system but, instead, explained some parts. While the State agreed NBS did not need to show some parts of the system in full operation, the State warned it must be assured by NBS's performance at the demonstration that the system would fully meet the requirements of the RFP. The State, exercising discretion expressly reserved to it in the RFP, determined NBS passed the benchmark demonstration.

On September 15, 1989, the State issued a formal notice of intent to award the contract to NBS. NIS and other unsuccessful bidders protested the award

to the Board. They contended the State improperly waived compliance with the mandatory requirements of the RFP. The Board delegated its responsibility to hold an evidentiary hearing to an administrative law judge (ALJ). The ALJ held a hearing lasting 39 days or parts of days. On April 27, 1990, he issued his 64-page order dismissing the protest of NIS and Unisys and affirming the notice of intent to award. The Board adopted the ALJ's decision as its own on June 5, 1990. The next day, the State and NBS signed a contract through June 30, 1994.

On June 7, 1990, two days after the Board adopted the ALJ's decision and one day after the contract was signed, NIS petitioned the superior court for a writ of administrative mandate. It sought an order directing the Board to set aside its decision. (See Code Civ. Proc., § 1094.5.) NIS contended the Board's decision was incorrect because, among other things, the Board (1) applied the wrong standard in deciding whether the State validly concluded NBS passed the benchmark demonstration, (2) made findings concerning NBS's performance at the demonstration which were not supported by sufficient evidence, and (3) allowed material deviations from the RFP on the security feature and actual size fingerprint requirements of the RFP.

The superior court issued an alternative writ of administrative mandate, and, after considering the administrative record and holding a hearing, issued a peremptory writ. The court found the Board applied an incorrect standard in deciding whether NBS passed the benchmark demonstration; it concluded the Board must decide whether NBS demonstrated specified mandatory requirements of the RFP " 'actually in operation.' " The court also concluded the State put NIS at a competitive disadvantage by leading NIS to believe it could not submit samples to the State for testing and approval after a specified date. The remainder of NIS's contentions was rejected.

The State and NBS appeal. They contend the superior court erred in issuing the peremptory writ because the Board applied the correct standard in determining whether NBS passed the benchmark demonstration and the Board's findings are supported by substantial evidence.

NIS also appeals. It contends the superior court erred by finding (1) the fingerprint samples submitted by NBS did not require rejection of the bid, (2) security features did not need to be approved before submission of final bids, and (3) the Board should have another chance to decide whether NBS passed the benchmark.

## DISCUSSION

### I

### *Conformity With the RFP*

 "Mandamus is issued 'to compel the performance of an act which the law specially enjoins . . . .' (Code Civ. Proc., § 1085.) Two requirements are essential: a clear, present and usually ministerial duty upon the part of the respondent, and a clear, present and beneficial right in the petitioner to performance of that duty. [Citation.] Mandamus is an appropriate remedy to compel the exercise of discretion by a government officer, but does not lie to control the exercise of discretion unless under the facts, discretion can be exercised in only one way. [Citations.]" (*Pacific Bell* v. *California State & Consumer Services Agency* (1990) 225 Cal.App.3d 107, 118 [275 Cal.Rptr. 62].)

Sections 12101 and 12102 of the Public Contract Code require the State to employ competitive bidding to acquire electronic data processing goods and services such as those sought by the State here. Section 12102 delegates to the Department of Finance and DGS the authority to establish policies and procedures for the acquisitions. The regulations establishing the policies and procedures are found in the State Administrative Manual.

Section 5201 of the State Administrative Manual also requires competitive bidding for electronic data processing goods and services, except in specified circumstances not relevant here. " 'A basic rule of competitive bidding is that bids must conform to specifications, and that if a bid does not so conform, it may not be accepted. [Citations.] However, it is further well established that a bid which substantially conforms to a call for bids may, though it is not strictly responsive, be accepted if the variance cannot have affected the amount of the bid or given a bidder an advantage or benefit not allowed other bidders or, in other words, if the variance is inconsequential. [Citations.] [¶] . . . "It is inconceivable that inconsequential departures will not appear. . . . But if the unit in toto, proposed to be erected, generally conforms to the [government's] needs and will substantially perform the service which the [government] requires, non-conformity between plan and bid does not exist." ' (47 Ops.Cal.Atty.Gen. 129, 130-131 (1966), quoting *Dougherty* v. *Folk* (1941) 46 N.E.2d 307, 311, italics added.)" (*Konica Business Machines U.S.A., Inc.* v. *Regents of University of California* (1988) 206 Cal.App.3d 449, 454 [253 Cal.Rptr. 591], italics omitted.)

 NIS generally alleges the State violated the competitive bidding requirements of the Public Contract Code and the State Administrative

Manual. Specifically, NIS claims section 5212 of the State Administrative Manual prohibits award of the contract to NBS because the NBS bid materially deviated from the requirements of the RFP.[2]

■ The court's review of the administrative decision extends "to the questions whether the [administrative agency] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [administrative agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) The courts review the findings and decision of the administrative agency under a substantial evidence standard, as here, when no fundamental vested right is implicated. (*Lowe* v. *Civil Service Com.* (1985) 164 Cal.App.3d 667, 675 [210 Cal.Rptr. 673].) "When the substantial evidence test applies, the trial court exercises an essentially appellate function in determining whether the administrative record is free from legal error. On appeal, our scope of review is identical to that of the trial court." (*Id.* at p. 676.)

A. *Benchmark Demonstration*

■ NIS contended, and the superior court agreed, the State materially deviated from the requirements of the RFP by the manner in which it conducted the benchmark demonstration on the NBS bid. The court found, contrary to the decision of the Board, NBS's failure to demonstrate that several aspects of the system were " 'actually in operation' " precluded the State from awarding the contract to NBS.

The RFP allowed the State to require the successful bidder to demonstrate its system before award of the contract: "This procurement may require a demonstration of the bidder's response to specific requirements . . . . The State reserves the right to determine whether or not a demonstration has been successfully passed."

In another section, the RFP also states: "Failure of the vendor to demonstrate that the claims made by the proposal, in response to the RFP requirement, are in fact true, may be sufficient to cause the proposal to be deemed

---

[2]State Administrative Manual section 5212 states, in part: "A bid cannot be accepted which deviates materially from the requirements specified in the solicitation document. A material deviation is one that is not in substantial accord with one or more solicitation document requirements, provides an advantage to one bidder over other bidders, or has a potentially significant effect on the delivery, quantity, quality, amount paid to the vendor, or on the cost to the State." Even though section 5212 refers specifically to the invitation for bids technique of procurement, the basic principles of competitive bidding, of which the material quoted above is a part, are applicable to use of an RFP in procurement, except as modified by State Administrative Manual section 5213.

non-responsive. The State reserves the right to determine whether or not the facility inspection and/or demonstration have been passed successfully."

These provisions of the RFP gave the State discretion at three different levels with respect to the demonstration. First, the State could decide whether to require a demonstration. Second, it could decide whether NBS passed the demonstration. And third, even if NBS failed the demonstration, the State could decide whether to award the contract or reject the bid.

The Board concluded NBS's performance at the benchmark demonstration did not preclude the State from awarding the contract to NBS. The superior court disagreed with the Board and found NBS's performance at the demonstration precluded the State from awarding it the contract.

The State contends NIS waived its right to complain about the standard employed in evaluating the bids. The RFP provided a preaward procedure for objecting to the handling of any issue other than selection of the successful bidder. The State argues NIS should have objected to the discretion afforded to the State in the benchmark demonstration and failure to make use of this procedure results in waiver. We reject this contention because NIS does not seek to change the RFP or challenge its validity. Instead, NIS seeks only to challenge the award of the contract to NBS. The type of protest provided for in the RFP specifically excludes issues relating to selection of the successful vendor.

The State, on appeal, seeks to emphasize that NIS and the other bidders understood the State would not require a demonstration of the system in operation. However, this assertion misses the point. The State is required to comply with the RFP, not the bidders' understanding of it.

The superior court held the State failed to comply with the RFP because it did not require NBS to show certain mandatory parts of the system were " 'actually in operation.' " Of the many requirements contained in the RFP, some were made "mandatory." Of the mandatory requirements, some were designated with an asterisk or "star." The RFP provided: "All requirements marked with an asterisk (*) will be included in the benchmark demonstration." It also stated: "It is mandatory that the facility inspection/benchmark be performed in substantial accordance with the conditions and approach specified in this RFP." The court relied primarily on this provision of the RFP: "This procurement may require a demonstration of the bidder's response to specific requirements (including benchmark requirements) before final selection in order to verify the claims made in the bid, corroborate the evaluation of the bid, and confirm that the hardware and software are

1456

*actually in operation*; in which case prior notice will be given. . . ." (Italics added.) The court concluded these provisions required NBS to demonstrate the starred, mandatory requirements " 'actually in operation.' " Failure to do so, the court declared, was a material deviation from the RFP and, thus, precluded award of the contract to NBS.

This interpretation is not supported by the language of the RFP. It is undisputed NBS did not have parts of the system fully functioning at the time of the demonstration. The State required NBS to demonstrate most parts of the system in operation. However, the State also informed NBS the State must be assured at the demonstration that the system as stated in the bid could fully meet the RFP requirements. For those parts not in operation, the State accepted NBS's demonstration of prototypes or explanations of how those parts of the system would work.

The demonstration of the photograph capture is an example of this process. Even though NBS did not demonstrate the photograph capture process, which is a starred, mandatory requirement of the RFP, in operation, the State accepted NBS's demonstration of a prototype system and an explanation of how the fully functioning system would differ from the prototype. The deviations between the prototype operating at the demonstration and the eventual, fully functioning system did not concern the State. The prototype could capture a photograph, digitize it, compress and decompress it, and reproduce it without distortion. These functions were performed within the 30-second time limit specified in the RFP except when the evaluators purposefully tested the system for unusual photograph capture situations, such as photographing a wheelchair-bound individual. The prototype also did not include all software the final system would contain. However, the software used at the demonstration showed NBS's capability to meet the requirements of the RFP. Believing the system would meet the requirements of the RFP when fully functioning, the State evaluators concluded NBS passed the demonstration of the photograph capture process.

As summarized by the Board: "[NBS] did not assemble a fully operational data capture station with all production software for the demonstration as that configuration will appear in final production. Rather, [it] demonstrated an operational prototype controlled and driven by software that demonstrated capability to meet the relevant starred mandatory requirements of the RFP. *The State's evaluators found the prototype's functions adequately demonstrated functionality and capability both directly and by representative exemplar to meet those requirements.* No advantage was provided to [NBS] over the other bidders. The differences between the demonstration and the

bid had no potentially significant effect upon the delivery, quantity, or quality of the service to be provided, or affected the cost to the State or the amount to be paid to the bidder." (Italics added.)

While NBS may not have shown all the starred, mandatory requirements in operation at the benchmark demonstration, this *allowed*, not mandated, the State to reject the bid. Again turning to the language of the RFP: "The State reserves the right to determine whether or not a demonstration has been successfully passed." Therefore, the State's acceptance of the bid and award of the contract to NBS conformed to the RFP. NIS does not contend NBS's bid materially deviated from the requirements for the system as reflected in the RFP and potential contract. NIS attacks only the procedure applied by the State and the State's alleged failure to require NBS to show the starred, mandatory requirements in operation at the benchmark demonstration.

NIS contends NBS failed to pass the benchmark demonstration with regard to some specific requirements contained in the RFP, and, therefore, the State could not validly award the contract to NBS. We need not consider individually the requirements on which NIS asserts NBS failed during the benchmark demonstration. The State retained the authority to award the contract to NBS, even if NIS's allegation of NBS's failure to demonstrate individual requirements is accepted as true.

The terms of the RFP relied on by the superior court do not require a different result. The State's agreement with NBS it would not require some of the hardware and software to be " 'actually in operation' " at the demonstration conformed to the overriding discretionary nature of the demonstration process. Reading the RFP as a whole, we conclude it gave the State discretion to award the contract to NBS even though some of the requirements of the RFP were not shown in operation at the demonstration. This reservation of discretion to the State in the *manner of determining compliance* with the RFP is consistent with the Legislature's intent to provide a flexible *process* for obtaining data processing systems. (See *Pacific Bell* v. *California State & Consumer Services Agency, supra*, 225 Cal.App.3d at p. 116.)

NIS claims the holding in *Konica Business Machines U.S.A., Inc.* v. *Regents of University of California, supra*, 206 Cal.App.3d 449, controls here. In *Konica*, the university issued a "Request for Quotation" in which it sought several kinds of copiers to meet various needs of the university. Each different type of copier had to meet certain performance specifications. Copy-Line submitted a bid in which the copiers did not all meet performance

specifications. Konica's bid, however, met all performance specifications. The university awarded the contract to Copy-Line. (*Id.* at pp. 451-453.)

The *Konica* court held the award must be set aside because the solicitation document did not allow bidders to bid machines not meeting the performance specifications. The university's failure to require conformity with the performance specifications in the bid gave Copy-Line a competitive advantage over the other bidders. (*Konica, supra,* 206 Cal.App.3d at p. 457.)

The solicitation document in *Konica* was different from the solicitation here. In *Konica,* the government wanted *equipment* meeting certain specifications. Unlike the solicitation for equipment in *Konica,* this case involves a solicitation for an integrated system to capture, store, and disseminate data and produce cards. The RFP identified what must be accomplished, and the vendors assembled bids to meet the requirements of the RFP. To assure itself the bid which looked best on paper could be successfully implemented, the State inserted in the RFP a discretionary benchmark demonstration. The question the State needed to answer before signing the contract was whether NBS could perform on the contract, not whether NBS already had the components of the system completed.

Unlike the deviation from the performance specifications in *Konica,* the discretion afforded to the State in the RFP here concerned only the manner in which the State would assure itself the successful bidder could perform the service requested. It did not include the discretion to alter the requirements of the integrated system.

The State did not give NBS a competitive advantage over the other bidders by not requiring all of the starred, mandatory requirements of the bid to be in operation at the benchmark demonstration. The State was not required to hold a benchmark demonstration, was not required to reject NBS's demonstration for failure to show any component in actual operation, and was not required to reject the bid even if NBS failed the demonstration. The relevant question was whether the State was persuaded NBS could perform on the proposed contract. After review of NBS's bid and a benchmark demonstration, the State's evaluators were persuaded NBS could fully meet the requirements of the RFP. This analytical process was faithful to the RFP, did not relieve NBS of the duty to provide the State with a system fully complying with the RFP, and did not give NBS a competitive advantage over the other bidders.

The State exercised the discretion expressly reserved to it in the RFP and decided to award the contract to NBS. If, as NIS contends, the State could

not award the contract absent a demonstration of the requirements in operation, then the State had no discretion to award the contract. This is contrary to the express language of the RFP. Since the State has already exercised its discretion in a manner allowed by the RFP, mandamus is not available to control that exercise. (See *Pacific Bell* v. *California State & Consumer Services Agency, supra,* 225 Cal.App.3d at p. 118.)

Other than those elements of the system we will discuss individually in this opinion, NIS does not contend the NBS bid did not meet the requirements of the RFP. Instead, NIS contends NBS did not adequately demonstrate them. Our conclusion the State· could validly award the contract to NBS despite the method used at the benchmark demonstration renders unnecessary a discussion of NIS's assertions concerning the components NIS alleges NBS did not adequately demonstrate.

B. *Security Laminate*

■ The superior court found the State misled NIS concerning whether the security laminate for the cards had to be preapproved. It also found the State did not notify NIS concerning the rejection of a security laminate and the reason for the rejection. The State contends the superior court erred by finding NIS was thus put at a competitive disadvantage. It argues substantial evidence supports the Board's factual findings and its decision NIS was not put at a competitive disadvantage.

The RFP required the cards produced by the system to have a security feature covering the entire face of the card. It provided: "Because of the extreme importance of document security, all proposed document security features will be extensively tested by the Department for resistance to alteration, duplication, simulation, and counterfeiting, as well as durability of the security feature. *Only* those security features passing departmental testing will be considered in the Final Proposal." (Italics in original.) In addition, the RFP stated: "It should be noted that only those documents that have been previously tested and have passed the Department's security and durability tests will be acceptable."

During the preparation of the bids, the State permitted the vendors to submit samples of the cards produced for testing. This allowed the State to evaluate the samples and give the vendors feedback on whether the cards met the requirements of the RFP. NIS asked the State when the last date was to submit the cards for testing, and the State replied: " 'The last date to submit a DL/ID card for testing/evaluation will be May 2, 1989. This will allow the State time to return the results to the vendor prior to submission of their final proposal.' "

On May 2, 1989, NIS submitted three security laminate samples to the State for testing. One of these was a transparent hologram developed by American Bank Note Holographics, Inc. (American Bank Note). This hologram was the least expensive of the proposed security laminates. On May 15, the State informed NIS one of the laminates passed the testing and one did not. However, the State did not include the results of the testing on the third laminate, the hologram. NIS inquired concerning the results of the hologram testing shortly after receiving the report on the other laminates. The State eventually responded, in late May, that the hologram was not acceptable, but it did not give NIS any reasons for the rejection.

On May 18, 1989, American Bank Note developed a more transparent version of its hologram in response to the State's rejection of the hologram laminates submitted by NIS and NBS. On May 19, American Bank Note contacted all four of the active bidders, including NIS, and advised each of them it had developed the more transparent hologram to correct the obstruction of data identified as the defect by the State. All four of the bidders sent a blank card to American Bank Note and, by May 26, each bidder had received its sample cards with the new, more transparent hologram affixed.

Even though NIS cooperated with American Bank Note by sending a sample card for the new hologram and conducted in-house testing after American Bank Note returned it, NIS then ceased efforts to prepare the hologram for a final bid. In its repeated efforts to follow up with NIS and cooperate in preparing the new hologram for inclusion in the final bid, American Bank Note received no response. On the other hand, NBS did respond and collaborated with American Bank Note in developing a better adhesive to bond the hologram to the card. NBS submitted the new hologram in what ultimately became the highest scoring bid.

NIS argues the RFP required preapproval of any security feature included in the final bids. The Board and the superior court rejected this construction of the RFP. While the RFP required testing of the security feature before it could be considered as part of the final bid, it did not require the testing to take place before the final bid was submitted. The superior court, however, found the State led NIS to believe its security feature had to be submitted for testing by May 2, 1989, by its letter stating " '[t]he last date to submit a DL/ID card for testing/evaluation will be May 2, 1989.' " The superior court concluded the combination of the State's misleading statement and the failure to notify NIS of the reason for the rejection of the hologram prevented NIS from submitting a bid including the hologram, putting NIS at a competitive disadvantage. This interpretation of the evidence, however, is contrary to the Board's interpretation.

■ This factual issue is subject to the substantial evidence test both in the superior court and here. (*Lowe* v. *Civil Service Com.*, *supra*, 164 Cal.App.3d at p. 676.) "In applying this test, the court may not consider evidence outside the administrative record [citation], must consider the entire record [citation], and must deny the writ if there is *any* substantial evidence in the record to support the findings [citation]." (*Smith* v. *County of Los Angeles* (1989) 211 Cal.App.3d 188, 198 [259 Cal.Rptr. 231], italics in original.)

■ The Board disbelieved NIS's assertion the RFP and the State's answer to its inquiry concerning the last date for submitting samples for testing led it to believe it could submit only preapproved security features in the final bid. The Board also disbelieved NIS's claim it did not know why the hologram had been rejected: "NIS's own conduct post-May 16, 1989 directly refutes [its] claims that [it] believed [it was] absolutely barred from using a security feature not submitted for testing before May 2 and approved, and that [it was] precluded from bidding the new, more transparent hologram because the State failed to notify NIS in writing of the reasons for the State's rejection of the more dense hologram. . . .

"Despite [its] stated belief that [it was] absolutely barred from using [samples not previously tested and approved] in a final bid, and despite a claim that [it] had no actual knowledge of the reasons for DMV's rejection of the more dense hologram, NIS received and responded immediately to [American Bank Note's] offer to submit sample cards to [it] for the application of the new, more transparent hologram in late May, well past the absolute bar date of May 2 for the submission of such a new feature. NIS furnished the sample cards and received back from [American Bank Note] [its] samples bonded with the new, more transparent hologram, on May 26, 1989, in sufficient time to incorporate them in a final bid. NIS subjected the new, more transparent holograms bonded to [its] sample cards to in-house testing after receipt. Such conduct demonstrates the claim of lack of knowledge of the reasons for rejection of the more dense hologram to be entirely lacking in credibility.

"The NIS/[American Bank Note] conduct is inconsistent with a belief that it was barred from bidding the new hologram. Such conduct discloses clear knowledge of the reasons for previous rejection of the more dense hologram derived from some source even though not from a written report from DMV. The conduct clearly demonstrates that NIS's claim of prejudice due to reliance upon a provision of the RFP that barred bidders from submitting previously untested samples in a final bid is a fabrication, conceived in order

to attempt to fasten blame upon the State for a decision NIS made for reasons of its own. One of those reasons was the poor adhesion of the new hologram to the NIS card samples, [because] all NIS personnel expressed dissatisfaction with the bonding and the ease with which the overlaminate could be removed, and [because it] expressed fear the hologram would be disqualified the same way [another laminate with bonding problems] had been. These problems were identified by NIS during [its] own in-house testing of the product post-May 27, when the product was received. Poor adhesion could result in disqualification or a poor score. NIS chose not to propose the [American Bank Note] hologram in a final bid. Although the State failed to communicate in writing the reasons for prior rejection of the more dense hologram, this failure did not prejudice NIS in the making of the decision not to submit the hologram in a final bid."

The superior court disagreed with the Board. It stated: "Although NIS was under the misimpression that it had missed the deadline, it would naturally continue to be curious about why its hologram had been rejected, especially since it was undoubtedly aware that other bidders were relying on that same security feature, produced by a common subcontractor. That NIS may have continued to work with the subcontractor to improve the security feature does not reasonably prove that it knew why the State had rejected the earlier version. Nor does it prove NIS knew that it could have submitted the revised version with its final bid despite having been told the contrary."

We disagree the Board's interpretation of and inferences drawn from the facts were unreasonable. The superior court attributed NIS's continued cooperation with American Bank Note and renewed in-house testing to curiosity. However, these facts also lead to a reasonable inference NIS knew why the hologram was rejected and knew it could submit a new hologram with its final bid. Substantial evidence supports the findings of the Board. Furthermore, the superior court based its interpretation on its assumption NIS had been misled and believed security features not submitted before May 2, 1989, were precluded from the final bids. The Board found NIS did not so believe based on the further in-house testing and limited cooperation with American Bank Note.

As the Board concluded: "NIS did not bid [American Bank Note's] more transparent hologram in a final bid for conscious business reasons of [its] own, related to [its] dissatisfaction with the product and [its] lack of confidence in [the hologram's] ability to meet the requirements. [NIS's] decision was not based on the State's failure to provide written reasons for the earlier rejection of the more dense hologram." Based on this interpretation, substantial evidence supports the Board's findings and NIS was not put at a competitive disadvantage.

## C. *Size of Fingerprint Samples*

NIS contends the NBS bid materially deviated from the RFP because NBS failed to produce actual size fingerprint reproductions. Because of this deviation, NIS argues, its protest should have been upheld.

As originally issued, the RFP included as a mandatory requirement actual size reproduction of rolled fingerprints. The reproduced fingerprints had to be on a one-to-one size ratio with the original. All bidders had problems meeting this requirement, and each expended substantial effort in attempting to create actual size reproductions. By the time of final bid submission, however, no bidder had succeeded in submitting to the State a sample meeting the actual size requirement.

NIS asserts Unisys succeeded in producing a sample meeting the actual size requirement. However, this assertion distorts the facts. Both Unisys and Polaroid produced a sample with an *average* of the horizontal and vertical scales equaling the *average* of the two scales of the original. In other words, the samples were slightly different from the original on both the horizontal and vertical scales. On one scale the samples were larger than the original and on the other scale smaller. Adding the two deviations together canceled them out. Neither Unisys nor Polaroid produced a sample matching the original on both scales.

Recognizing the problems the vendors had in meeting the actual size requirement, the State amended the RFP on May 19, 1989. However, instead of deleting the references to actual size and one-to-one ratio, the State deleted the requirement that the reproduced fingerprint samples be acceptable to law enforcement, which acceptability was the source of the actual size requirement. In addition, after May 19, the State continued to reject fingerprint samples not meeting the actual size requirement.

None of the samples submitted with any of the final bids met the actual size requirement, and all were untested and unapproved. Nonetheless, the State found all of the samples acceptable under the mandatory requirements of the RFP.

The Board concluded this approach gave none of the bidders a competitive advantage. Although each bidder expended additional time and finances in attempting to meet the actual size requirement, "[e]ach bidder was affected relatively equally and adversely."

The superior court agreed: "When all the final proposals failed to meet the standard, the [State] apparently determined the requirement was unnecessary. The State passed all bidders' samples. NIS, therefore, suffered no

competitive disadvantage as a result of the State's failure to require NBS to meet the actual-size requirement."

On appeal, NIS contends the NBS fingerprints samples deviated from the actual size requirement by 10 percent. Since another vendor's fingerprint sample failed the preapproval process and only deviated from the actual size requirement by 8 percent, NIS reasons the NBS deviation, therefore, had to be material. On the other hand, NIS argues two of its own fingerprint samples deviated only by 2 percent, one larger than actual size and the other smaller. NIS asserts: "Thus, on average, the NIS samples actually were on a one-to-one size ratio. Moreover, even if NIS deviated slightly from the RFP requirement, there was no determination that such deviation was *material*." (Italics in original.) This reasoning fails. While the RFP allowed the State to waive immaterial deviations, it did not require it. Therefore, whether the deviations from the actual size requirement were material is beside the point. The State decided not to draw a line between material and immaterial deviations and, instead, resigned itself to the realization none of the bidders could meet the actual size requirement; therefore, it eliminated the requirement.

Claiming it would be contrary to competitive bidding laws, NIS contends the State was without power to waive the mandatory actual size requirement. This assertion would be correct if any bidder had been successful in submitting a bid which met the requirement. ■ However, a deviating bid can be accepted as substantially complying with the RFP requirements if no bid meets the specific requirement. This solution meets the practical needs of the State and puts no bidder at a competitive disadvantage. (*Konica Business Machines U.S.A., Inc.* v. *Regents of University of California, supra*, 206 Cal.App.3d at p. 454.) ■ Here, no bidder could meet the actual size requirement, and no bidder was put at a competitive disadvantage. NBS's failure to meet the actual size fingerprint requirement of the RFP did not disqualify NBS from award of the contract.

D. *Conclusion*

NIS fails to show abuse of discretion in the Board's decision in any regard. It was not put at a competitive disadvantage by the actions of the State. Therefore, the superior court erred by issuing the peremptory writ.

II

*Stay of Performance, Attorney Fees, and Judicial Notice*

Throughout this litigation, NIS has sought and the other parties opposed a stay of performance of the contract between the State and NBS. Our decision upholding the Board's dismissal of the NIS protest renders this dispute moot.

NIS also sought to recover attorney fees under Code of Civil Procedure sections 1021.5 (private attorney general) and 1028.5 (small business against regulatory agency). This issue is also rendered moot by our decision because NIS has not prevailed.

NIS's requests for judicial notice contained in its respondent's brief regarding various internal legislative documents are denied.

### DISPOSITION

The judgment is reversed and remanded with directions to enter judgment denying the petition for a writ of administrative mandate. DGS, DMV, the Board, and NBS shall recover their costs on appeal.

Sims, Acting P. J., and Raye, J., concurred.

The petition of appellant National Identification Systems, Inc., for review by the Supreme Court was denied March 25, 1993.