[No. A071235. First Dist., Div. Three. May 22, 1996.]

GHILOTTI CONSTRUCTION COMPANY, Plaintiff and Appellant, v.
CITY OF RICHMOND, Defendant and Respondent;
GHILOTTI BROTHERS CONSTRUCTION, INC., Real Party in Interest.

**COUNSEL**

Norris & Norris, Richard E. Norris, Douglas C. Straus and Joshua G. Genser for Plaintiff and Appellant.

Malcolm Hunter for Defendant and Respondent.

Nossaman, Guthner, Knox & Elliott, William T. Bagley and Michael G. Thornton for Real Party in Interest.

## OPINION

**PARRILLI, J.**—In this case we hold that a public entity may waive inconsequential deviations from contract specifications in a public contract bid. To be considered inconsequential, a deviation must neither give the bidder an unfair competitive advantage nor otherwise defeat the goals of insuring economy and preventing corruption in the public contracting process.

Appellant Ghilotti Construction Company (GCC), the second lowest bidder on a contract for a road construction project in respondent City of Richmond (the City), petitioned the trial court for a writ of mandate or prohibition to prevent the City from contracting with the low bidder on the project, real party in interest Ghilotti Brothers Construction, Inc. (GBCI). GCC contended GBCI's bid deviated from contract specifications because it showed that GBCI would subcontract more than 50 percent of the work on the project. The trial court denied the petition. We affirm. The city council properly awarded the contract to GBCI, finding the irregularity in its bid insubstantial.

### BACKGROUND

The City issued an invitation for bids on a construction project on Cutting and Canal Boulevards (the Cutting/Canal Project) in May 1995. The invitation reserved "the right to reject any or all Bids or to waive any informalities in the bidding." The city engineer's estimate for the project was $2,577,383. On June 1, 1995, the City received bids from three contractors. GBCI bid $2,419,598; GCC bid $2,714,201; and RGW Construction, Inc., bid $2,774,765. On June 2, the City received a letter from GCC objecting to the award of the contract to GBCI on the ground that GBCI's bid indicated it would subcontract more than 50 percent of the project.

The contract documents incorporated standard specifications issued by the California Department of Transportation (CalTrans). These specifications included the following requirement: "The Contractor shall perform with his own organization contract work amounting to not less than 50 percent of the

original total contract price, except that any designated 'Specialty Items' may be performed by subcontract and the amount of any such 'Specialty Items' so performed may be deducted from the original total contract price before computing the amount of work required to be performed by the Contractor with his own organization." The City's bid proposal did not designate any specialty items. CalTrans typically gives that designation to items such as landscaping, striping, and electrical and joint trench work. In a letter responding to GCC's protest, GBCI argued that if such items were deducted from the original contract price, GBCI would have been performing 78.7 percent of the remaining work. However, GBCI's bid showed it would be subcontracting 55.44 percent of the total contract price.

The City's office of contract compliance issued a memorandum on June 13, 1995, analyzing the three bids for the Cutting/Canal Project. The memorandum noted both GBCI and GCC had exceeded the City's goals for subcontracting to minority and local businesses, but GBCI's bid appeared to violate the limit on subcontracting imposed by the CalTrans standard specifications. The memorandum also observed the City had waived or disregarded this requirement on previous projects, including a 1991 street project and another recent San Pablo Avenue project on which appellant GCC had performed less than 50 percent of the work itself. The memorandum concluded there was sufficient precedent to award the contract to GBCI, the lowest responsive bidder.

The city council met on June 26, 1995, to consider the contract for the Cutting/Canal Project. The office of contract compliance memorandum was presented, and oral presentations were made in the following order. Jim Ghilotti, vice-president of GCC, argued that GCC's bid had been dramatically affected by the restriction on subcontracting. He claimed GCC could have made its bid $90,000 lower by using a subcontractor for storm drain work. He also contended GCC had not violated the subcontracting restriction on the San Pablo project identified in the office of contract compliance memorandum. Frank Ruona, vice-president of GBCI in charge of estimating and construction management, told the city council he had the bid documents from the San Pablo project; he asserted they showed that GCC had not complied with the 50 percent requirement at bid time but had reduced the dollar amounts allotted to various subcontractors by paying for materials itself instead of purchasing the materials through the subcontractors. Ruona noted GBCI had tried to use local and minority subcontractors to comply with the City's priorities. Mario Ghilotti, vice-president and general manager of GBCI, mentioned previous projects on which GBCI had been low bidder but had not been awarded the contracts because it had failed to meet the

City's requirements for using local and minority subcontractors. He claimed GCC was using "good sharp lawyers" to try to disqualify GBCI's low bid on the Cutting/Canal Project when GBCI could have shown it would be performing 55 percent of the project by making minor alterations in its bid.

John Knox, counsel for GBCI, told the city council that if GBCI were allowed to adjust its figures by paying for subcontractors' materials, as GCC had done on the San Pablo project, GBCI would meet the 50 percent requirement without raising its bid. Rick Norris, counsel for GCC, told the city council it was legally required to reject GBCI's bid because it did not conform to specifications. Norris argued a deviation must be considered substantial unless it could not have affected the amount of the bid, and that GCC's bid was higher by at least $90,000 because it had complied with the rules. A council member observed that the $90,000 difference was insufficient to make up the gap between the bids of GCC and GBCI. Norris responded that the $90,000 was the simplest example GCC was able to document, but that GCC believed its bid would have been lower than GBCI's had it not been for the 50 percent requirement, and would be lower if the project were rebid without that requirement.

The city manager recommended the city council award the contract to GBCI. He cited the City's past practice in dealing with the 50 percent requirement when awarding contracts, the insufficiency of GCC's asserted $90,000 savings to displace GBCI as the lowest bidder, the necessity of awarding the contract by June 30 in order to receive state funding, and the fact that only GBCI's bid had come in under the City's estimate, so that if the contract were given to one of the other bidders more money would have to be budgeted for the project. The city manager suggested the city council waive the 50 percent requirement as "nonsubstantive and inconsequential." The City Attorney stated "for further clarification" that the city council would be waiving any irregularity in GBCI's bid on the ground it was not substantial. The city council unanimously voted to award the contract to GBCI.

On June 29, 1995, GCC filed its writ petition in the trial court, and at the same time sought a temporary restraining order to prevent the City from executing a contract with GBCI for the Cutting/Canal Project. On July 11, the trial court denied the application for a temporary restraining order, issued an alternative writ, and set a hearing on the issues raised by the writ petition. The parties submitted declarations and exhibits for the trial court's review. Frank Ruona declared that the time pressure on bid submissions was the reason GBCI's bid was not structured to reflect subcontracting of less than

50 percent of the work on the project. Ruona stated that by purchasing $300,000 in materials and supplies for one subcontractor, GBCI could show it was performing 55.7 percent of the work as measured by the contract price, without changing the amount of its bid.

At the hearing on July 25, 1995, the trial court observed GCC had presented no evidence demonstrating GBCI's bid would necessarily have been higher if it were structured to conform with the 50 percent requirement. Counsel for GCC admitted there was no such evidence, but argued it was not legally required. GCC contended any adverse effect on other bidders due to the other bidders' compliance with contract specifications was sufficient to disqualify GBCI's bid, whether GBCI's noncompliance had affected its bid or not. GCC also urged that allocating work to subcontractors generally confers an economic advantage on the contractor. GBCI pointed out that RGW Construction, Inc., the other bidder on the Cutting/Canal Project, had proposed subcontracting 62 percent of the work and yet came in with the highest bid. GBCI claimed its deviation from the 50 percent requirement was insignificant in light of its showing that it could meet the requirement without changing the amount of its bid. The trial court issued a notice of decision on July 26 denying the writ petition and discharging the alternative writ, without making specific findings. On August 15, 1995, judgment was entered in conformance with the trial court's decision.

GCC filed a notice of appeal on August 18, 1995. On August 30, 1995, this court summarily denied GCC's petition for a writ of supersedeas or other stay order, and for an immediate stay of the trial court's judgment.

DISCUSSION

I

In reviewing the award of a public contract, our function is the same as the trial court's—to decide whether the public entity's decision is supported by substantial evidence. Our review is limited to an examination of the proceedings to determine whether the City's actions were arbitrary, capricious, entirely lacking in evidentiary support, or inconsistent with proper procedure. There is a presumption that the City's actions were supported by substantial evidence, and GCC has the burden of proving otherwise. We may not reweigh the evidence and must view it in the light most favorable to the City's actions, indulging all reasonable inferences in support of those actions. (*Boydston* v. *Napa Sanitation Dist.* (1990) 222 Cal.App.3d 1362, 1369 [272 Cal.Rptr. 458]; *Konica Business Machines U.S.A., Inc.* v. *Regents of University of California* (1988) 206 Cal.App.3d

449, 453 [253 Cal.Rptr. 591] (*Konica*); *Taylor Bus Service, Inc.* v. *San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1340-1341 [241 Cal.Rptr. 379].)[1] Mandamus is an appropriate remedy to compel the exercise of discretion by a government agency, but does not lie to control the exercise of discretion unless under the facts, discretion can only be exercised in one way. (*National Identification Systems, Inc.* v. *State Bd. of Control* (1992) 11 Cal.App.4th 1446, 1453 [15 Cal.Rptr.2d 257]; *Pacific Bell* v. *California State & Consumer Services Agency* (1990) 225 Cal.App.3d 107, 118 [275 Cal.Rptr. 62].)

■ In determining whether a bid is responsive to a solicitation for bids, and whether a deviation from contract specifications may be disregarded as insubstantial, the contracting entity must provide the bidder with notice and allow it to submit materials concerning the issue of responsiveness. However, the entity need not conduct a hearing, make formal findings, or otherwise comply with the due process requirements for determining whether a bidder is responsible, which were defined by the Supreme Court in *City of Inglewood-L.A. County Civic Center Auth.* v. *Superior Court* (1972) 7 Cal.3d 861, 870-871 [103 Cal.Rptr. 689, 500 P.2d 601]. (*Taylor Bus Service, Inc.* v. *San Diego Bd. of Education, supra,* 195 Cal.App.3d at pp. 1341-1343.)

The City was required to award the contract for the Cutting/Canal Project "to the lowest responsible bidder after notice." (Pub. Contract Code, § 20162.)[2] "A basic rule of competitive bidding is that bids must conform to specifications, and that if a bid does not so conform, it may not be accepted. [Citations.] However, it is further well established that a bid which substantially conforms to a call for bids may, though it is not strictly responsive, be accepted if the variance cannot have affected the amount of the bid or given a bidder an advantage or benefit not allowed other bidders or, in other words, if the variance is inconsequential. [Citations.]" (47 Ops.Cal.Atty.Gen.

---

[1]GCC argues that our review is de novo, because only a legal issue is involved. We disagree with GCC's formulation of the issue in this case, as our discussion below makes clear.

We also note we must follow the standard of review applied in traditional mandamus proceedings under Code of Civil Procedure section 1085, rather than the standard applicable to administrative mandamus under Code of Civil Procedure section 1094.5. It is not clear from the record in this case which variety of mandamus proceeding GCC intended to pursue, but since administrative mandamus is not available to address the issue of compliance with bid specifications, GCC's petition is deemed to seek a traditional writ of mandate. (See *Taylor Bus Service, Inc.* v. *San Diego Bd. of Education, supra,* 195 Cal.App.3d at p. 1339.)

[2]In the absence of a city charter provision governing the bidding process, Public Contract Code section 20162 applies. (See *R & A Vending Services, Inc.* v. *City of Los Angeles* (1985) 172 Cal.App.3d 1188, 1191-1192 [218 Cal.Rptr. 667].) The City's contract documents for the Cutting/Canal Project also stated that the project would be given to "the lowest responsible bidder."

129, 130 (1966), quoted with approval in *National Identification Systems, Inc. v. State Bd. of Control, supra,* 11 Cal.App.4th at p. 1453, and *Konica, supra,* 206 Cal.App.3d at p. 454.)

GCC's arguments, both in the trial court and on appeal, are almost entirely based on *Konica,* in which the court explored at length whether a variance from specifications was substantial enough to disqualify a bid.[3] In *Konica,* the University of California advertised a "Request for Quotation" on a contract for photocopy machines and service, including detailed performance specifications for various categories of copy machines. Konica was underbid by Copy-Line. The university awarded Copy-Line the contract even though the machines designated in its bid did not meet the required specifications in two categories, whereas Konica's bid met or surpassed all the performance specifications. (206 Cal.App.3d at pp. 451-453.) The court examined the difference in the quoted prices for conforming and nonconforming machines and noted neither Copy-Line nor the university directly disputed the fact that strict adherence by Copy-Line to the performance specifications would have resulted in an increased bid. (*Id.* at p. 455.) Because the deviation from specifications gave Copy-Line a competitive advantage, the court concluded the contract had to be set aside. (*Id.* at p. 457.)

GCC contends that under *Konica,* any deviation from bid specifications having a potential impact on the amount of a bid is consequential and requires the bid to be disqualified, without considering whether the bid was in fact affected by the deviation. GCC claims such a potential impact is undisputed here, citing a declaration by the City's senior engineer to the effect that the bid specifications for the Cutting/Canal Project were based on estimates of site conditions and the quantities of various items, but that "[t]he final cost of the work for this project can vary based upon the actual work performed by the contractor and its subcontractors."

GCC's argument distorts both the record in this case and the reasoning of the *Konica* court. The engineer's statement does not indicate that project cost can vary based on the relative amounts of work performed by the contractor and its subcontractors. Such a general proposition has little analytical value; an example of its uncertainty is found in the fact that the highest bidder on the Cutting/Canal Project proposed the most extensive use of subcontractors. The engineer merely stated that variations between the estimated and actual

---

[3]*National Identification Systems, Inc. v. State Bd. of Control, supra,* did not involve a deviation from specifications; the issue there was whether a bidder's performance on a benchmark demonstration of capability to perform the project precluded acceptance of the bid. (11 Cal.App.4th at p. 1458.)

costs of performing the work may affect the final cost of the project. The *Konica* court carefully noted the actual impact of Copy-Line's deviation and emphasized there was no real dispute that Copy-Line's bid would have been higher if it met the performance specifications. (*Konica, supra,* 206 Cal.App.3d at p. 455.) The opposite concession was made here—GCC's counsel admitted to the trial court that there was no evidence showing GBCI would have submitted a higher bid had it complied with the specification restricting the use of subcontractors. Under the rationale of *Konica,* and the established rule in cases of variation from bid specifications, this admission justified the trial court in upholding the contract award to GBCI.

"Whether in any given case a bid varies substantially or only inconsequentially from the call for bids is a question of fact." (47 Ops.Cal.Atty.Gen., *supra,* at p. 131.) Under *Konica,* the factual issue to be resolved is whether the variation resulted in an unfair competitive advantage in the bidding process. The *Konica* court noted the Attorney General's opinion only considered a public entity's power to accept a substantially conforming bid, without addressing the issue of disadvantage to an unsuccessful bidder whose bid strictly conformed to the advertised requirements. The court suggested the acceptability of "substantial" compliance is suspect when some bids meet the specifications fully and others do not. (206 Cal.App.3d at p. 454.) "But, more significantly, the Attorney General concludes a deviation is substantial unless it is so inconsequential that it *could not affect the amount of the bid.* We presume Copy-Line equipment will substantially perform the service actually required by the University even though it does not meet the performance and production specified in every category. We then limit our analysis to whether the deviations gave Copy-Line an unfair competitive advantage by allowing it to make a lower bid than it would have been able to make without the deviations. (See *L. Pucillo & Sons v. Mayor and Council, etc.* (1977) 73 N.J. 349 [375 A.2d 602, 605-606] [factors to determine whether deviation is minor irregularity or substantial departure include whether deviation could be vehicle for favoritism, affect amount of bid, influence potential bidders to refrain from bidding, or affect ability to make bid comparisons]; *Harry Pepper & Assoc. v. City of Cape Coral* (Fla.Dist.Ct.App. 1977) 352 So.2d 1190, 1193.)" (*Konica, supra,* 206 Cal.App.3d at pp. 454-455, italics in original.)

In *Harry Pepper & Assoc. v. City of Cape Coral* (Fla.Dist.Ct.App. 1977) 352 So.2d 1190, 1193, the court stated: "The test for measuring whether a deviation in a bid is sufficiently material to destroy its competitive character is whether the variation affects the amount of the bid by giving the bidder an advantage or benefit not enjoyed by the other bidders. 64 Am.Jur.2d, *Public*

*Works and Contracts*, Section 59 (1972)." ■ Here, GBCI assured the city council it could comply with the subcontracting limitation without changing the amount of its bid, by purchasing some materials directly instead of through subcontractors, as it claimed GCC had done on the recent San Pablo Avenue project. GCC did not argue to the city council or to the trial court that GBCI could not have met the contract specifications in this way. Nor did GCC indicate it was unaware of this method of structuring a bid, or unable to use it in formulating its own bid. Therefore, GCC failed to carry its burden of showing that GBCI had an unfair competitive advantage.

The other factors identified in *Konica*'s reference to *L. Pucillo & Sons* v. *Mayor and Council, etc.* (1977) 73 N.J. 349 [375 A.2d 602] support the conclusion that the deviation in GBCI's bid was inconsequential; there was no indication the deviation was a vehicle for favoritism, affected the city council's ability to make bid comparisons, or discouraged other potential bidders from submitting bids. It is significant, as the city attorney made clear immediately before the council voted on the contract award, that the City did not waive the necessity of complying with the subcontracting limitation altogether. Instead, it found the margin of GBCI's noncompliance—approximately 5.5 percent—to be insubstantial. If the city council had simply waived the necessity of compliance, other bidders would have been disadvantaged. Those who did submit bids may have come in with significantly altered amounts. Others may have been encouraged to submit bids if they knew the subcontracting limitation would be ignored. However, GBCI showed its bid could be brought into compliance with only slight alterations and without affecting the amount of the bid. The city council properly waived the irregularity in the bid as inconsequential.

■ GCC directs our attention to the following policy considerations stated in *Konica, supra*: "The purpose of requiring governmental entities to open the contracts process to public bidding is to eliminate favoritism, fraud and corruption; avoid misuse of public funds; and stimulate advantageous market place competition. (See legis. intent declared in Pub. Contract Code, § 10300; *Miller* v. *McKinnon* (1942) 20 Cal.2d 83, 88 . . . ; *Terminal Const. Corp.* v. *Atlantic Cty. Sewer Auth.* (1975) 67 N.J. 403 [341 A.2d 327, 330].) Because of the potential for abuse arising from deviations from strict adherence to standards which promote these public benefits, the letting of public contracts universally receives close judicial scrutiny and contracts awarded without strict compliance with bidding requirements will be set aside. This preventative approach is applied even where it is certain there was in fact no corruption or adverse effect upon the bidding process, and the deviations would save the entity money. (*Ibid.*; *L. Pucillo & Sons* v. *Mayor*

*and Council, etc., supra,* 375 A.2d at p. 605; *Harry Pepper & Assoc.* v. *City of Cape Coral, supra,* 352 So.2d at pp. 1192-1193.) The importance of maintaining integrity in government and the ease with which policy goals underlying the requirement for open competitive bidding may be surreptitiously undercut, mandate strict compliance with bidding requirements. (*Gil-Bern Construction Corp.* v. *City of Brockton* (1968) 353 Mass. 503 [233 N.E.2d 197, 199].)" (206 Cal.App.3d at pp. 456-457.) GCC observes the Supreme Court cited this passage from *Konica* with approval in *Domar Electric, Inc.* v. *City of Los Angeles* (1994) 9 Cal.4th 161, 176 [36 Cal.Rptr.2d 521, 885 P.2d 934] (*Domar*).

We note the *Konica* court made the above observations only after it concluded that Copy-Line's deviation from specifications had given it a competitive advantage over Konica. Similarly, the *Domar* court's reference to this passage came after it decided the City of Los Angeles could validly require bidders to demonstrate good faith efforts to include minority- and women-owned subcontractors in public contract bids, so that the plaintiff's bid was properly rejected for failure to comply with the requirement. Substantial compliance was not an issue in *Domar*, because the plaintiff had completely failed to comply with the subcontractor outreach requirement. In *Gil-Bern Construction Corp.* v. *City of Brockton* (1968) 353 Mass. 503 [233 N.E.2d 197, 200], a bidder failed to comply with a requirement that contractors include a specified construction progress analysis. The appellate court held this was properly waived as a minor deviation. The court observed the public had not been harmed in any way, but noted this factor has been deemed irrelevant when the deviation is a substantial one. The rule of strict compliance with bidding requirements does not preclude the contracting entity from waiving inconsequential deviations.

Other cases cited by *Konica, supra,* for the proposition that a deviating bid must be set aside despite the absence of corruption or actual adverse effect on the bidding process make it clear that the deviation must be capable of facilitating corruption or extravagance, or likely to affect the amount of bids or the response of potential bidders. (*Terminal Const. Corp.* v. *Atlantic Cty. Sewer. Auth.* (1975) 67 N.J. 403 [341 A.2d 327, 331-332]; *L. Pucillo & Sons* v. *Mayor and Council, etc., supra,* 375 A.2d 602, 606.) These considerations must be evaluated from a practical rather than a hypothetical standpoint, with reference to the factual circumstances of the case. They must also be viewed in light of the public interest, rather than the private interest of a disappointed bidder. "It certainly would amount to a disservice to the public if a losing bidder were to be permitted to comb through the bid proposal or license application of the low bidder after the fact, [and] cancel the low bid

on minor technicalities, with the hope of securing acceptance of his, a higher bid. Such construction would be adverse to the best interests of the public and contrary to public policy." (*Judson Pacific-Murphy Corp.* v. *Durkee* (1956) 144 Cal.App.2d 377, 383 [301 P.2d 97].)

In *Domar*, *supra*, our Supreme Court emphasized the necessity of a pragmatic approach, placing the public interest above the interests of the bidders: "As one leading treatise explains: 'The provisions of statutes, charters and ordinances requiring competitive bidding in the letting of municipal contracts are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable, and they are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest. These provisions are strictly construed by the courts, and will not be extended beyond their reasonable purpose. Competitive bidding provisions must be read in the light of the reason for their enactment, or they will be applied where they were not intended to operate and thus deny municipalities authority to deal with problems in a sensible, practical way.' (10 McQuillin, Municipal Corporations (3d rev. ed. 1990) § 29.29, p. 375, fns. omitted.) Thus, [laws] requiring competitive bidding are not to be given such a construction as to defeat the object of insuring economy and excluding favoritism and corruption. [Citations.]" (9 Cal.4th at p. 173.) Under the circumstances of this case, we are satisfied that the award of the contract for the Cutting/Canal Project to GBCI was fully consistent with the public policy concerns stated in *Konica* and *Domar*. There is no evidence of favoritism, corruption, fraud, extravagance, or uncompetitive bidding practices.

## II

In *Valley Crest Landscape, Inc.* v. *City Council* (1996) 41 Cal.App.4th 1432 [49 Cal.Rptr.2d 184] (*Valley Crest*), our colleagues in the Third District recently decided a bid indicating that 83 percent of the work would be subcontracted was nonresponsive to a 50 percent limitation in the contract specifications, and could not be accepted by waiving the irregularity. We find *Valley Crest* distinguishable from this case. To the extent its reasoning is inconsistent with ours, we respectfully disagree.

In *Valley Crest*, as here, the second lowest bidder on a city project protested the lowest bid due to its failure to comply with a contract requirement that the bidder perform at least 50 percent of the work itself. The

lowest bid, by North Bay Construction, Inc. (North Bay) was $4,077,675; the second lowest bid, by Valley Crest Landscape, Inc. (Valley Crest) was $4,088,000. Valley Crest's protest letter noted that permitting a postbid inquiry and clarification would unfairly give North Bay an opportunity to reconsider whether it really wanted the project. Nevertheless, the city engineer contacted North Bay regarding its subcontracting figures, warning North Bay its bid would be considered nonresponsive unless further information was forthcoming. North Bay responded that the 83 percent figure was "not correct," and was the product of estimated subcontracting amounts which were all that were available until just before the bid closing. North Bay provided " 'actual correct subcontractor percentages' totaling 44.65 percent." The city engineer and the public works director spot-checked the revised percentages by contacting the five largest subcontractors, and were satisfied the new figures were accurate. The city attorney recommended waiving the bid irregularity because the revised bid was in compliance, the subcontracting limitation was not a legal requirement but merely a request by the city, and the irregularity had not given North Bay a competitive advantage over other bidders. The city council voted to award the contract to North Bay. Valley Crest sought a writ of mandate requiring the city to enforce the Subletting and Subcontracting Fair Practices Act (Pub. Contract Code, § 4100 et seq.) against North Bay, and to award the contract to Valley Crest. The trial court denied the petition. (41 Cal.App.4th at pp. 1435-1437.)

The Third District reversed, reviewing the trial court's conclusion de novo as a matter of statutory interpretation. The court quoted *Konica, supra,* 206 Cal.App.3d 449, on the rule permitting waiver of inconsequential irregularities. However, the court held this rule did not apply, even if the change in North Bay's percentages only corrected a clerical error. (*Valley Crest, supra,* 41 Cal.App.4th at pp. 1437, 1440-1441.) The court followed the approach taken by *Menefee* v. *County of Fresno* (1985) 163 Cal.App.3d 1175 [210 Cal.Rptr. 99] (*Menefee*), a case in which the lowest bidder's failure to sign the bid on the appropriate line of the proposal sheet was held not to invalidate the bid, because the bid was signed in other places and the accompanying bid bond was signed.

The *Valley Crest* court derived from *Menefee* the rule that a bid irregularity may only be waived if it would not give the bidder an unfair advantage by allowing it to withdraw its bid without forfeiting the bid bond. (See *Menefee, supra,* 163 Cal.App.3d at pp. 1180-1181.) "Applying the same test here, we conclude North Bay had an unfair advantage because it could have withdrawn its bid. Misstating the correct percentage of work to be done by a subcontractor is in the nature of a typographical or arithmetical error. It

makes the bid materially different and is a mistake in filling out the bid. As such, under Public Contract Code section 5103, North Bay could have sought relief by giving the City notice of the mistake within five days of the opening of the bid.[4] That North Bay did not seek such relief is of no moment. The key point is that such relief was available. Thus, North Bay had a benefit not available to the other bidders; it could have backed out. Its mistake, therefore, could not be corrected by waiving an 'irregularity.' " (*Valley Crest, supra*, 41 Cal.App.4th at p. 1442.)

We note two significant factual distinctions between *Valley Crest* and this case. First, the original bid in *Valley Crest* exceeded the 50 percent limitation by 33 percent, whereas GBCI's bid proposed to subcontract approximately 5.5 percent more work than was permissible. Clearly, on the face of the bids it is more difficult to consider the large discrepancy in *Valley Crest* an inconsequential irregularity. Second, in *Valley Crest* the city told North Bay its bid would be considered nonresponsive in the absence of further information, giving North Bay the opportunity to withdraw its bid. Here, there is no indication the City gave GBCI an opportunity to withdraw its bid because of the deviation from the limitation on subcontracting. To the contrary, the office of contract compliance memorandum notes only that GBCI's bid "appears to be in violation" of the limitation, and expressly deems GBCI to be the "lowest and responsive bidder."

The most important distinction between this case and *Valley Crest*, however, is that GCC has never contended GBCI had a competitive advantage because it could have withdrawn its bid under Public Contract Code section 5103.[5] We believe the ability to withdraw is a more significant factor in cases involving formal defects in bids, such as the missing signature in *Menefee, supra*, 163 Cal.App.3d 1175, than it is in cases involving deviation from contract specifications. Public Contract Code section 5103, subdivision

---

[4]In a footnote at this point the *Valley Crest* court states: "Moreover, apart from the relief afforded by section 5103 of the Public Contract Code, the City gave North Bay the opportunity to withdraw its bid. The City's letter to North Bay stated the bid would be considered nonresponsive unless North Bay provided additional information." (41 Cal.App.4th at p. 1442, fn. 1.)

[5]Public Contract Code section 5103 establishes the following prerequisites for obtaining relief from the responsibility to perform on a bid for a public contract:

"The bidder shall establish to the satisfaction of the court that:

"(a) A mistake was made.

"(b) He or she gave the public entity written notice within five days after the opening of the bids of the mistake, specifying in the notice in detail how the mistake occurred.

"(c) The mistake made the bid materially different than he or she intended it to be.

"(d) The mistake was made in filling out the bid and not due to error in judgment or to carelessness in inspecting the site of the work, or in reading the plans or specifications."

(d) bars relief from mistakes resulting from errors in judgment or carelessness in examining contract specifications. *Konica*, the leading California case on deviation from specifications, does not cite *Menefee*, or discuss the low bidder's ability to back out as a factor in analyzing whether the deviation resulted in a competitive advantage. Nevertheless, when properly raised, as in *Valley Crest*, this can be a relevant consideration. It was discussed in *Harry Pepper & Assoc. v. City of Cape Coral, supra*, a Florida case cited by *Konica*. (See *Harry Pepper & Assoc. v. City of Cape Coral, supra*, 352 So.2d at p. 1193; *Konica, supra*, 206 Cal.App.3d at pp. 455-457.) Since the parties did not argue this theory below, however, we do not consider it further.[6]

## DISPOSITION

The judgment is affirmed. The City and GBCI shall recover their own costs on appeal.

Corrigan, Acting P. J., and McGuiness, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied August 28, 1996.

---

[6]GCC submitted a supplemental letter brief after *Valley Crest* was issued, urging us to take a similar approach. We decline to do so for the reasons stated above. We note *Valley Crest* does not break new ground in discussing the low bidder's ability to withdraw its bid. *Menefee, supra*, 163 Cal.App.3d 1175, introduced that theory, and GCC cited *Menefee* both to the trial court and in its opening brief on appeal, without making an issue of GBCI's ability to withdraw. It is too late for GCC to raise this theory for the first time in the proceedings. (See *Estate of Stevenson* (1992) 11 Cal.App.4th 852, 864-865 [14 Cal.Rptr.2d 250]; *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 29 [21 Cal.Rptr.2d 104].)

At oral argument, GCC contended *Valley Crest* stands for the proposition that a potential competitive advantage precludes waiver of a bid irregularity, without the necessity of showing any actual advantage. We disagree. The *Valley Crest* court held North Bay had an actual advantage, not only because it could have obtained relief under the Public Contract Code as a matter of law, but also because the city expressly gave North Bay the opportunity to withdraw its bid. (41 Cal.App.4th at p. 1442, and fn. 1.)

*Judge of the Alameda Superior Court sitting under assignment by the Chairperson of the Judicial Council.