[No. A122534. First Dist., Div. Two. Apr. 19, 2010.]

CYPRESS SECURITY, LLC, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

1004

COUNSEL

Fox Rothschild and Alexander J. Hernaez for Plaintiff and Appellant.

Dennis J. Herrera, City Attorney, Danny Chou, Chief of Complex Litigation, and Owen J. Clements, Chief of Special Litigation, for Defendants and Respondents.

## OPINION

**KLINE, P. J.**—Cypress Security, LLC (Cypress), former provider of security services for the San Francisco Department of Human Services (DHS), lost to competitor Guardsmark, LLC (Guardsmark), in contract proceedings initiated by DHS through a request for proposals (RFP). Cypress sought mandate (Code Civ. Proc., § 1085) against the City and County of San Francisco (City), DHS, and Guardsmark to have the award to Guardsmark set aside. The court denied relief, and Cypress appeals.[1] We affirm.

### BACKGROUND

### *RFP Process and Award*

The process, under chapter 21 of the San Francisco Administrative Code (SFAC) ("Acquisition of Commodities and Services"),[2] began with the issuance of RFP No. 356 in September 2007. The RFP was for a period of four or more years, described services needed, qualifications and process, and added: "Proposals meeting the minimum qualifications shall be scored on a point scale of 100 points per rater. All proposals will be rated according to the criteria indicated in Attachment C—Evaluation Criteria, of this RFP." The

---

[1] The City and DHS appear on appeal as respondents. Guardsmark, real party in interest below, did not appear there and does not appear here.

[2] The chapter differentiates between a "Proposal," meaning "a response to a request for proposals issued by the City for Commodities or Services" (SFAC, § 21.02, subd. (*o*)), and a "Bid," meaning "a bid, quotation, or other offer, other than a Proposal, from a person or entity to sell a Commodity or Service to the City at a specified price" (*id.*, subd. (a)).

SFAC section 21.4, titled "**Invitations for Competitive Proposals or Qualifications**," provides in pertinent part: "(a) **Authorization; Evaluation Criteria.** A Contracting Officer may issue a request for Proposals . . . for the selection of Professional Service Contractors following consideration of the evaluation factors set forth in the request for Proposals, which may include cost, except as prohibited by law. . . . A request for Proposals . . . [may be] issued directly by the department.

"(b) **Negotiation.** The Contracting Officer is authorized to negotiate terms and conditions, including price, with the highest ranked Proposer. If the Contracting Officer cannot conclude a contract that, in the opinion of the Contracting Officer is in the City's best interest, the Contracting Officer may terminate negotiations with the highest ranked Proposer. In the event that the Contracting Officer cannot conclude negotiations with the next highest ranked Proposer on terms acceptable to the City, then the Contracting Officer may negotiate with each successively ranked Proposer. [¶] . . . [¶]

"(d) **Content of Requests for Proposals.** A request for Proposals shall specify evaluation criteria for selection, and shall reserve the right to reject or cancel the request for Proposals in whole or in part."

RFP stated: "[A]ny proposal may be rejected if it is conditional, incomplete and/or deviates from the specifications contained in this [RFP]. . . . [T]he City's representatives have the right to reject any or all proposals or to waive deviations, which are immaterial to performance. . . . [M]inor defects may be waived at the discretion of the City."

Of the 100 rating points, the evaluation criteria allotted up to 40 for strengths of the contractor, 20 for organizational capacity, and 40 for "Fiscal areas," setting point values for subparts within each of the criteria. At issue on this appeal are 30 points allotted to this "Fiscal areas" subpart we will call the pricing-structure subpart: "1. Evaluate pricing structure. Keep in mind that the proposed expenses in the rate[3] should relate to proposed services. Are the salaries/wages proposed realistic and competitive? Are there excessive proposed expenses? Did they propose less hours than estimated in the RFP? Consider the reasonableness of this pricing with the pricing of other respondents proposing the same services. Is the guard wage structure adequate for San Francisco based wages and benefits?" A second subpart allotted up to 10 points for the respondent/contractor's "fiscal strength" to meet its obligations.

A stated qualification was: "The Contractor is **preferred** to have an existing collective bargaining agreement, as the existing guards are SEIU local 24-7."

Cypress and Guardsmark, and four other qualified companies, submitted proposals. For the pricing-structure subpart, Cypress proposed hourly wages

---

[3] "Rate" referred to this "hourly rate" submission requirement: "Attach a detailed bid pricing using information found in Attachment B, cost proposal. Include total hourly cost proposed for this contract, including all overhead, supervision and applicable local, state and federal taxes. **Price will be a major evaluation factor**." The title page for Attachment B, titled "Pricing Format," similarly stressed, "**Pricing is a Major Evaluation Criterion**."

Attachment B advised in part: "All proposals should show a comprehensive breakdown for the hourly rate proposed: Please show any increase to proposed rates during each subsequent year of the contract period:

"Rates should list: [¶] . . . [¶]

"1. Direct Salaries and Benefits broken out for security personnel assigned to DHS including hourly rates for supervisors/management, security guards.

"2. Benefits afforded to the security guards, health, dental, sick pay, holiday pay, pension, paid time off.

"3. General and administrative costs.

"4. Proposed Profit (as a fixed fee).

"5. Equipment costs."

and rates[4] that undercut Guardsmark's for all time periods in the RFP.[5] Guardsmark and Cypress were the top scorers, and DHS Director of Contracts David Curto asked them additional questions, to be scored up to a further 50 points. The request sought details about (1) compensation packages for guards, including pay levels for new and absorbed employees (15 points), (2) pay and provisions for uniforms (five points), (3) enforcement of conduct standards (10 points), (4) tailoring of services to "the unique profile" of DHS clients, who included welfare recipients, seniors, homeless, and others, some not speaking English as a first language (10 points), and (5) initial and ongoing training, and any related employee compensation (10 points).

Both companies responded. Cypress wrote in part that entry-level hourly pay would be the higher of $11.62 or the demands of a new collective bargaining agreement (CBA) negotiated by SEIU (Service Employees International Union) Local 24/7. Guardsmark wrote that entry-level pay would be $12.00 an hour and that pay rates for security officers absorbed through the contract would not be reduced. Both companies were signatories to the CBA, which would be in effect the duration of the contract.

[4] A chart provided by Cypress proposed in part:

"

|  | Jan 2008 Jun 2008 | Jul 2008 Jun 2009 | Jul 2009 Jun 2010 | Jul 2010 Jun 2011 | Jul 2011 Jun 2012 |
|---|---|---|---|---|---|
| Straight Wage Rate | $12.19 | $12.49 | $12.79 | $13.09 | $13.39 |
| Benefits, Medical, Dental, Life Insurance | $2.86 | $2.96 | $3.06 | $3.16 | $3.26 |
| Vacation, Sick, Holiday | $1.24 | $1.26 | $1.29 | $1.32 | $1.35 |
| Hourly Billable Rate (Straight Time) | $22.42 | $22.90 | $23.39 | $23.87 | $24.36 |

"

[5] Guardsmark provided three pricing models. Model 3, the most costly, was based on staffing hours as called for in the RFP. Model 2, less costly, was based on a 5.3 percent reduction Guardsmark recommended through staff reductions and greater use of electronics, having visited and evaluated two of the DHS facilities. Model 1, the least costly, was based on a 10 percent reduction that Guardsmark might achieve. All three models used the same hourly rates. Model 3 was in part this:

"

| Fiscal Year | Jan 2008 June 2008 | July 2008 June 2009 | July 2009 June 2010 | July 2010 June 2011 | July 2011 June 2012 |
|---|---|---|---|---|---|
| Hours St. | 158,268 | 158,268 | 158,268 | 158,268 | 158,268 |
| Rate: | $23.52 | $24.17 | $24.84 | $25.52 | $26.24 |
| Total Price: | $3,722,463.36 | $3,825,337,56 | $3,931,377.12 | $4,038,999.36 | $4,152,952.32 |

"

As can be seen, the first time period erroneously shows hours for a full rather than half year. This in turn created error in each of Guardsmark's pricing models but was noticed by DHS, and corrected by Guardsmark, before any consideration by the evaluation panel.

The proposals were then scored by members of a DHS evaluation panel (three members for the initial proposal and the same three, plus a fourth, for the supplement). Curto tabulated and averaged the scores and announced a tentative decision, through a letter of December 17, 2007, that Guardsmark had the winning proposal. Of the 150 potential points, Guardsmark scored an average of 134 (89 plus 45) and Cypress an average of 121 (85 plus 36). Scoring sheets for each panelist were attached. Average scores for the pricing-structure subpart were 28 for Guardsmark and 27 for Cypress. Proposals by two companies offering billing rates lower than Cypress's or Guardsmark's were also rejected, having scored third and fourth place among six qualified proposals.

### Administrative and Writ Challenges

Cypress filed a formal challenge, raising its current appeal arguments, plus others. In a letter of February 5, 2008,[6] DHS Executive Director Trent Rhorer rejected all arguments, thus approving the tentative decision, which remained subject to successful negotiations with Guardsmark, and approval by the San Francisco Human Services Commission (Commission) and Board of Supervisors (Board).

In postaward negotiations with Guardsmark, DHS's budget analyst office (the analyst's office) examined the billing rate for wages and benefits required under the new CBA, but the only needed upward adjustment was for a health plan. Guardsmark's base hourly wage rate already exceeded the CBA by a full dollar for the first fiscal year.

The Commission gave its approval at a public hearing on February 28, during which Cypress orally reiterated its protest arguments.

After the Commission decision, but before consideration by the Board, Curto drafted a nine-page memo of March 24 (the Curto memo) that responded to questions raised by the analyst's office, particularly assertions made by Cypress at the Commission hearing that awarding the contract to Cypress would save the City millions of dollars. The last three pages were "an **equitable** comparative analysis" of the Guardsmark and Cypress proposals using the RFP "contract hours and time frame," explaining: "Under this analysis the Cypress proposal is adjusted to the same number of hours, the same base wage rate as proposed by Guardsmark and the same health plan as contained in the new [CBA]. All other rate breakdown elements remain the same. [¶] [Cypress's] proposed billing rates are adjusted to meet the new [CBA] for health benefits and adjusted to the base hourly rate from $12.19 to

---

[6] All unstated further dates are in 2008.

$13.00 to match Guardsmark. (Note: timeframe and hours are as proposed in the RFP.) The time frame under this resolution varies by [four] months from the time frame published in the RFP."

The Board's Budget and Finance Committee (Finance Committee) gave its approval at a public hearing on April 9. Members heard from Cypress employees and officers who praised Cypress's performance and urged that keeping Cypress would save money. Three of the speakers represented, in particular, that contracting with Cypress over Guardsmark would save $6 million. The president and founder of Cypress stressed this and reiterated Cypress's protest arguments about Guardsmark's proposal being nonresponsive.

Matters such as cost savings and lower wage rates from Cypress were discussed by Curto, budget analyst Harvey Rose (whose own report urged adopting the contract), and Finance Committee members. Concerning Cypress's claim of a $6 million saving, Curto explained that the claim had grown from $4.6 million at protest, to $5 million before the Commission, and now $6 million, and that the cost analysis with Rose's office had been done in part to resolve such discrepancies. Rose, relying in part on the Curto memo showing an estimated savings of $481,314 from contracting with Guardsmark over Cypress, recommended approving the contract. The committee did so, sending it on for the full Board to consider. The full Board approved the award to Guardsmark on April 22.

Cypress filed a verified petition for writ of mandate on May 2, raising essentially the same issues raised on this appeal—that DHS failed to apply the evaluation criteria set forth in the RFP and arbitrarily increased Cypress's proposal through the "equitable comparative analysis," and that Guardsmark's proposal was nonresponsive and should have been rejected because it proposed three alternative bids, exceeded a page limitation, and was not submitted with a proper financial statement.

After briefing and argument, the court adopted this tentative ruling: " 'The writ is denied. The Court reviews the matter under an abuse of discretion standard. The bid of Guardsmark substantially complies with the RFP. The Guardsmark bid with three alternative illustrative proposals was consistent with the RFP because the hourly rate did not change. Both Guardsmark and Cypress exceeded the page limitation and included attachments consistent with the DHS representation that [this] was acceptable. Neither party complied with financial documentation requirement[s] and both parties demonstrated the financial capacity to provide the services. The review panel

followed the criteria in the RFP and price was only one factor. Assuming Cypress was entitled to additional points for price and/or that DHS considered higher compensation when that factor was not set forth in the RFP, DHS had the discretion to make the award where other delineated factors were favorable to Guardsmark. (*R & A Vending Services, Inc. v. City of Los Angeles* (1985) 172 Cal.App.3d 1188, 1193 [218 Cal.Rptr. 667]; *Monterey Mechanical Co. v. Sacramento Regional County Sanitation Dist*[.] (1996) 44 Cal.App.4th 1391 [52 Cal.Rptr.2d 395].) Finally, the Board of Supervisors considered several factors including the testimony of [Cypress's] representatives that explained [Cypress's] position on the cost analysis. The record does not support the conclusion that price was [the] primary factor; it was one among other factors presented to the Board.' "

## DISCUSSION

Cypress claims abuse of discretion in that (A) DHS used unstated criteria to "punish[]" it for proposed wages that were lower than Guardsmark's, contrary to RFP statements that pricing was a "major" factor; and (B) Guardsmark's proposal should have been rejected as nonresponsive to the RFP because it (1) contained three alternative wage scenarios rather than one, (2) exceeded a 20-page limit, and (3) omitted a proper financial statement.

## I. *Review Standards*

"Appellate review of the award of a public contract is governed by certain well-established principles. In a mandamus action arising under Code of Civil Procedure section 1085, we limit our review to an examination of the proceedings before the agency to determine whether its findings and actions are supported by substantial evidence. [Citations.] 'Our review is limited to an examination of the proceedings to determine whether the City's actions were arbitrary, capricious, entirely lacking in evidentiary support or inconsistent with proper procedure. There is a presumption that the City's actions were supported by substantial evidence, and [petitioner/plaintiff] has the burden of proving otherwise. We may not reweigh the evidence and must view it in the light most favorable to the City's actions, indulging all reasonable inferences in support of those actions. [Citations.] Mandamus is an appropriate remedy to compel the exercise of discretion by a governmental agency, but does not lie to control the exercise of discretion unless under the facts, discretion can only be exercised in one way. [Citations.]' [Citation.]"

(*MCM Construction, Inc. v. City and County of San Francisco* (1998) 66 Cal.App.4th 359, 368 [78 Cal.Rptr.2d 44] (*MCM*), quoting *Ghilotti Construction Co. v. City of Richmond* (1996) 45 Cal.App.4th 897, 903–904 [53 Cal.Rptr.2d 389] (*Ghilotti*).)

## II. Cypress's Claims of Abuse

### A. Use of Unstated, Contradictory Criteria

■ Generally, a public entity's failure to use correct and exclusive criteria to award a public contract may constitute an abuse of discretion. (*Monterey Mechanical Co. v. Sacramento Regional County Sanitation Dist., supra*, 44 Cal.App.4th at pp. 1412–1413 [award to second-lowest bidder set aside where board used wrong criteria to evaluate "good faith effort" of lower bidder to comply with affirmative action goals, beyond the exclusive criteria of Pub. Contract Code, § 2000].) Cypress's claim of abuse, however, assumes that the pricing component, twice stressed in the RFP as a "**Major**" criterion or factor, necessarily stressed "low price." It did not.

San Francisco is a charter city (see generally *MCM, supra*, 66 Cal.App.4th at pp. 372–373), and the parties appear to accept that the charter removed this contract from various Public Contract Code requirements (*Ghilotti, supra*, 45 Cal.App.4th at p. 904, fn. 2). The RFP procedure used to secure this services contract differed, under its own implementing provisions, from an alternative process known as an invitation for bids (IFB). Awards under the IFB process must go to "the lowest responsible and responsive Bidder whose Bid meets the requirements and criteria set forth in the [IFB]" (SFAC, § 21.3, subd. (e)), while the process used here spelled out the award criteria in the RFP (see, *ante*, at p. 1005, fn. 2; e.g., *Blue Cross of California v. State Dept. of Health Care Services* (2007) 153 Cal.App.4th 322, 325 [62 Cal.Rptr.3d 772]).

As declared in the writ proceedings by director of contracts David Curto: "The security services provided at DHS are considerably more comprehensive than those needed at other City sites . . . where security is focused on limiting access and safeguarding property. Security officers at DHS have direct contact with clients, staff and the general public throughout the working day. Indeed, they are often the first point of contact for people accessing services or information at DHS sites. The clients served by DHS are generally the hardest to serve populations, comprising the poor and needy, frail and elderly, many with mental health and substance abuse symptoms.

Many clients are non-English speaking or speak limited English. [¶] Many of the security officers currently employed at DHS facilities are themselves former clients of DHS. DHS has a vested interest in the success of these security officers in their careers, and in the ability of these security officers to maintain economic self-sufficiency based on the wages paid to them under the DHS contract. [¶] Because of the importance of the services provided by DHS's security contractor, the varied nature of the sites covered by the DHS contract, and the challenging nature of the various assignments, DHS does not award its contract for security services to the low bidder under an [IFB] type of procedure. Instead, DHS has used the [RFP] process to select its security contractor on three separate occasions since 2000. The RFP process allows DHS to award the security contract based on a number of factors, including the quality of the services to be provided, the reliability of the service provider, the wages and benefits offered to the guards, and the price charged to DHS. Although it may sometime[s] be beneficial to award contracts for goods, general services, or construction projects to the lowest bidder, experience has demonstrated that professional services contracts should not be awarded based exclusively on the lowest bid. Instead, professional services contracts should be awarded based on the best services provided at a reasonable price." We recognize that this *exact* wording was not in the RFP, but Cypress was aware of the RFP process, having won its previous contract by scoring nine points higher than Guardsmark in responses to RFP No. 256, issued in 2004. Having been the contractor for four years, Cypress was also uniquely aware of the unusual demands of the work.

The language of the current RFP was consistent with Curto's explanation. It identified the close public contact and need for bilingual skills and, in the evaluation criteria, identified 10 separately graded subparts under three broader criteria of contractor strengths, organizational capacity, and "[f]iscal areas." The pricing-structure subpart was just one of 10. It is true, as Cypress notes, that only that particular subpart was stressed in the RFP as a "**major**" criterion or factor, but labeling it *major* only stated the obvious, for it was the only criterion assigned a potential score of 30 points (out of 100). More importantly, it begs the decisive question whether Cypress reasonably construes *major* as meaning DHS meant to stress only *low* price. We reject that construction.

Low price was implicitly an important consideration, but neither the overall RFP nor its pricing-structure subpart expressly used the term "low price" or indicated that a "lowest responsible bidder" would prevail. This distinguishes cases where a bid request or Public Contract Code provision requires that awards be made to a lowest responsible bidder. (E.g., *Ghilotti,*

*supra*, 45 Cal.App.4th at p. 904 & fn. 2; *Valley Crest Landscape, Inc. v. City Council* (1996) 41 Cal.App.4th 1432, 1435, 1438 [49 Cal.Rptr.2d 184]; see also *R & A Vending Services, Inc. v. City of Los Angeles, supra*, 172 Cal.App.3d at p. 1193 [defining a city's discretion under a charter-based award to lowest responsible bidder]; see also *Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 176–177 [36 Cal.Rptr.2d 521, 885 P.2d 934].) Rather, the RFP read: "The *top-ranked* bidder whose proposal is determined to meet the needs of the City will be recommended to negotiate a proposed contract" (italics added); "If DHS is unable to negotiate a satisfactory agreement with the winning respondent, DHS may terminate negotiations with that respondent and proceed to negotiate with other qualified respondents *in the order of their ranking* in the evaluation process" (italics added).

Even the pricing-structure subpart itself advised: "Keep in mind that the proposed expenses in the rate should relate to proposed services. Are the salaries/wages proposed realistic and competitive? Are there excessive proposed expenses? Did they propose less hours than estimated in the RFP? Consider the reasonableness of this pricing with the pricing of other respondents proposing the same services. Is the guard wage structure adequate for San Francisco based wages and benefits?" This necessarily posed tension between implicit goals of efficient hours and services and goals of "realistic and competitive" wages and a "guard wage structure" that was "adequate for San Francisco based wages and benefits." We reject Cypress's attempt to read that language as limiting DHS's interest to *minimally* adequate wages and benefits. The specific mention of San Francisco, a notoriously expensive place to live, belies the notion, as does the call for "realistic and competitive" wages in such an area.

For all of those reasons, we reject the notion that a balancing of cost saving against adequate benefits and wages was inconsistent with or uncontemplated by the RFP.

We also reject Cypress's claim that consideration of the Curto memo's "equitable comparative analysis" was an undisclosed "factor" in the evaluation process. It was not an evaluation "factor" at all; it was a postaward side-by-side comparison of the two top-ranked proposals, adjusted to meaningfully coincide in rates, hours, and the CBA. This was an implicitly predictable part of the approval—not the award—process. Nor can Cypress reasonably complain that the analysis constituted an unauthorized "departure from the contents of its original bid." Cypress's proposal had been considered

*without the memo* by the evaluation panel and on the administrative appeal, and the memo played no part in the Commission's approval. It did not even exist until the public hearing before the Finance Committee, where it was discussed in and attached to budget analyst Rose's report. Rose and Curto also spoke at the Finance Committee hearing, answering questions about the analysis and responding to speakers from Cypress.

Indeed, the timing of the Curto memo raises a critical issue of relevance that is blurred in Cypress's briefing. The memo played no part in the process until the Board's Finance Committee hearing. In reviewing a decision, we may consider only matters that were before the decision maker at the time of its decision (*In re Zeth S.* (2003) 31 Cal.4th 396, 405 [2 Cal.Rptr.3d 683, 73 P.3d 541]; *People's Home Sav. Bank v. Sadler* (1905) 1 Cal.App. 189, 193–194 [1 P. 1029]), and the Curto memo therefore has no relevance to abuse of discretion by DHS, or any possible error in DHS's decision on the administrative appeal or the Commission's approval of the contract. All Cypress can argue is that the Curto memo led to error of some kind in the Finance Committee giving final approval, yet Cypress's own representatives spoke at length at the hearing, had ample opportunity to fault the memo, and had their remarks considered.

Squarely addressing the timing problem for the first time in its reply brief, Cypress argues: "[N]owhere does the City point to any evidence that the rationale informing the analysis was not used during the scoring process. Indeed, Cypress submits that the only way to explain the illogical scoring of the price factor . . . is through the myopic lens of the so-called analysis. No other explanation for this anomaly has even been offered by the City." The City has had no opportunity to brief this belated argument, but it nevertheless fails for at least two reasons. First, it is the burden of an appellant—not the respondent—to show error by an adequate record. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574–575 [24 Cal.Rptr. 664, 715 P.2d 624].) Thus, it is Cypress's duty to show consideration of a Curto-type analysis during the evaluation and award process. The record shows none; the claim therefore fails as based on pure surmise; and the City has no burden to show anything further. Second, Cypress's claims of illogic obviously rest in large part on its flawed view that a comparative analysis *of any kind,* and particularly a weighing of cost savings against adequate benefits, violated the terms of the RFP. We have rejected that view.

To the extent that Cypress means to fault Curto's analysis as otherwise flawed or mathematically incorrect, and to argue that this amounts to some sort of error in the final approval given by the Board and its Finance Committee, as distinct from DHS error, the argument is too little, too late. It is too little because it is presented as sniping based on bits of evidence, not a

comprehensive analysis of facts and figures needed to mount what constitutes a substantial evidence question (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 317 [2 Cal.Rptr.2d 649]); it is too late because it arises for the first time in a reply brief (*Nelson v. Gaunt* (1981) 125 Cal.App.3d 623, 641 [78 Cal.Rptr. 167]; *Utz v. Aureguy* (1952) 109 Cal.App.2d 803, 808 [41 P.2d 639]).

## B.  Nonresponsive Proposal

■  " 'A basic rule of competitive bidding is that bids must conform to specifications, and that if a bid does not so conform, it may not be accepted. [Citations.] However, it is further well established that a bid which substantially conforms to a call for bids may, though it is not strictly responsive, be accepted if the variance cannot have affected the amount of the bid or given a bidder an advantage or benefit not allowed other bidders or, in other words, if the variance is inconsequential. [Citations.]' [Citation.]" (*Ghilotti, supra*, 45 Cal.App.4th at pp. 904–905; see *Valley Crest Landscape, Inc. v. City Council, supra*, 41 Cal.App.4th 1432, 1435, 1438.) To merit setting aside, "the deviation must be capable of facilitating corruption or extravagance, or likely to affect the amount of bids or the response of potential bidders. [Citations.]" (*Ghilotti*, at p. 908.)

We acknowledge the City's suggestion that this doctrine, born of IFB situations and public works contracts (*Ghilotti, supra*, 45 Cal.App.4th 897; *Valley Crest Landscape, Inc. v. City Council, supra*, 41 Cal.App.4th 1432), should not apply with the same force to the inherently more flexible setting of an RFP like the one before us. We have no need to resolve that question, for Cypress's claims all fail under the doctrine. We do stress, however, that responsiveness considerations "must be evaluated from a practical rather than a hypothetical standpoint, with reference to the factual circumstances of the case. They must also be viewed in light of the public interest, rather than the private interest of a disappointed bidder" hoping to prevail by identifying " 'minor technicalities' " in the winning submission. (*Ghilotti*, at pp. 908–909.)

**1. Alternative models.** We find no merit to the argument that Guardsmark's pricing component was nonresponsive because it was set out in three models, rather than one. Model 3 was undisputedly responsive in that it proposed wages based on the number of hours contemplated by the RFP. Models 1 and 2 used precisely the same hourly wages, altering only the number of hours based on projected hours reductions it hoped to achieve. The trial court correctly saw no material prejudice or advantage in this, because

an evaluator could make a "very straight line calculation" of "[t]he number of hours times hourly rate" to compare Cypress's cost projections the same way.[7]

Also, Guardsmark's hours-reduced models were based on what it anticipated could be accomplished with more efficient staffing and more use of technology. This was responsive to the RFP, which read, as to the services requested: "DHS sees great potential in the creative use of equipment and personnel to provide more cost-efficient and effective security. *DHS expects each respondent to propose the use of appropriate technology and devise creative deployment schemes for use of personnel. [DHS] encourages respondents to develop a proposal that includes built-in efficiencies of staffing and costs.*" (Italics added.) Guardsmark did that, elsewhere in the proposal, and its pricing models 1 and 2 simply projected the potential cost savings. This efficiency component was vital enough that the budget analyst's recommendation to the committee was to "amend the proposed resolution to require HSA [(Human Services Agency)] to report back to the [committee] on possible reductions in costs based on the forthcoming efficiency plan to be provided by Guardsmark to the HSA."

The pricing models were not nonresponsive.

**2. Exceeding the page limit.** An RFP requirement for proposals was that "[t]he narrative must be submitted on standard white paper . . . double spaced, and no longer than **20 pages** (excluding attachments)." Cypress complains that Guardsmark's was 42 pages (without attachments), a 115 percent deviation that could not be "dismissed as not material," and gave Guardsmark "twice the amount of space to convince the [panel] that it should receive a higher score under the various evaluation criteria."

The parties seem to differ on what constitutes the "narrative" part of Guardsmark's proposal, to which the limitation applied. The City deems it 26 pages, but Cypress deems it 42. Whatever the figure, Cypress ignores a declaration by Curto that, at a "pre-bid conference" where the question of length came up, Curto told all prospective respondents that "DHS had not rejected a proposal for being over the page limit during my tenure as Director of Contracts." Guardsmark and Cypress were both represented there, and Curto had authority under the charter to issue and thus set the terms of the RFP (see, *ante*, at p. 1005, fn. 2). In effect, Curto clarified the RFP by telling all prospective respondents that exceeding the page limit would not be deemed a material deviation. We see no abuse of discretion in Curto standing

---

[7] Cypress does not raise any challenge to a very early correction of error in the number of hours assumed in Guardsmark's initial proposal (see, *ante*, at p. 1007, fn. 5).

by his word, and this was surely what the court below meant in writing that the page limit deviation, which both competitors violated, was "consistent with the DHS representation that [this] was acceptable."

**3. Financial statement.** The evaluation criteria asked, as to the fiscal-strength component potentially worth 10 points, "Has the Respondent demonstrated sufficient fiscal strength cash/lines of credit to ensure meeting the fiscal obligations imposed by this magnitude of workforce?" Average scores on this component were eight for Cypress and nine for Guardsmark, both within the "Acceptable/Good" range for that component. The RFP required, for submissions, a financial statement, instructing, "[p]rovide a copy of the complete financial statement as published based on a fiscal period not more than eighteen (18) months old at the time of submission, certified [*sic*] by an independent certified public accountant is preferred."

Neither competitor strictly complied with that provision. Cypress provided a 2005 federal tax return showing gross receipts or sales of $6.37 million, but it was not certified by an accountant.

Guardsmark's response read: "Guardsmark is a privately held corporation and does not release financial statements to the public. However, Guardsmark's financial strength and stability is a matter of record. The Company is ranked fourth among the nation's largest providers of security services. Fiscal year 2006 revenues exceeded $549 million. [¶] Based on revenues, Guardsmark is among the 680 largest private companies in the United States. Guardsmark employs more than 19,100 people, making [it] one of the 150 largest privately held U.S. employers. Guardsmark serves over 400 cities with more than 155 offices throughout the United States, Canada, the United Kingdom, and Asia." There followed further general information,[8]

---

[8] "We are pleased to provide the following indicators of our success:

"• For 27 years, Guardsmark has grown organically in both revenues and operating income at a double-digit compounded annual rate that exceeds 12%—*without a single merger or acquisition.* **Guardsmark is the fastest growing security firm in America.**

"• We have never been bankrupt nor have we ever had a bond or surety canceled or forfeited.

"• J.P. Morgan, one of America's premiere international banking companies, and PriceWaterhouseCoopers, one of the five largest accounting firms in the world, have both served Guardsmark for over 30 years.

"• American International Group, Inc. (AIG), an A++ rated insurance carrier and the leading U.S.-based international insurance organization, has provided Guardsmark's casualty insurance since 1978 without interruption. Guardsmark was highlighted in AIG's 1998 Annual Report.

"• Our company-wide 20-year average Experience Modification Factor of .55 is the lowest known in the industry.

"• Our Tax Identification Number is: 62-1043970.

"• Our Dun and Bradstreet number is: 00-705-5551; rating = IR3."

a promise of more during contract negotiations and, meanwhile, contacts for a senior vice-president for data or information.

Cypress claims that its own lack of compliance with the financial statement requirement is immaterial, perhaps reasoning that if its own proposal should also have been rejected as nonresponsive, then the remedy is to start over with a new RFP. We agree that Cypress's noncompliance is immaterial, but for the different reason that a nonresponsiveness claim is viewed "in light of the public interest, rather than the private interest of a disappointed bidder" hoping to prevail by identifying " 'minor technicalities' " in the winning submission. (*Ghilotti, supra*, 45 Cal.App.4th at pp. 908–909.) It is not clear how relative noncompliance by Cypress affected the public interest in this matter.

Rather, Cypress does not show how lack of certification or other variance by Guardsmark put the public in material danger of contracting with a financially unsound or risky entity. Guardsmark adequately established its financial stability and strength by reference to public sources and, while reticent to make further disclosure in the proposal itself, was willing to satisfy further questions during negotiations and, in the meantime, through communication with a vice-president designated as authorized to answer such questions.

Curto declared that he initially considered Guardsmark's financial submission in November 2007 and was satisfied of the company's financial strength, particularly in light of the City's concern, from prior contracts, that delays in payment by the City could require a company to advance funds to cover as many as three full payroll cycles, in amounts from $200,000 to $600,000, an ability also specified in the RFP as a minimum qualification. Curto related that, after receiving Cypress's letter of protest: "I asked Guardsmark to submit a copy of its full Dun and Bradstreet report. Robert Jensen sent me a Dun and Bradstreet report on Guardsmark, run on January 2, 2008. This report confirmed Guardsmark['s] financial strength. According to [the report], Guardsmark had 18,000 employees and owned a 75,450 square foot multi-story brick office building as its headquarters. The report listed Guardsmark's 2006 sales at $460,115,000, and did not show any significant past due payments, any large outstanding judgments, or any other indications that Guardsmark had bad credit. This information confirmed my earlier conclusion that Guardsmark had sufficient resources and was financially responsible to perform the contract."

No abuse of discretion appears; the financial information from Guardsmark did not require rejection of the proposal as nonresponsive.

Because Cypress fails to demonstrate abuse of discretion or other error, we have no occasion to consider the parties' positions as to what remedy, if any, Cypress might be entitled to upon a remand.

## DISPOSITION

The judgment is affirmed.

Haerle, J., and Richman, J., concurred.