Filed 4/13/23  Securus Technologies v. Department of Technology CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SECURUS TECHNOLOGIES, LLC, | C095097 |
| Plaintiff and Respondent, | (Super. Ct. No. 34202180003594CUWMGDS) |
| v. | |
| DEPARTMENT OF TECHNOLOGY et al., | ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION |
| Defendants and Appellants; | |
| GLOBAL TEL*LINK CORPORATION, | [NO CHANGE IN JUDGMENT] |
| Real Party in Interest and Appellant. | |

THE COURT:

It is ordered that the nonpublished opinion filed herein on March 20, 2023, be modified as follows:

1. At page 17, delete the last sentence in footnote 17 and replace it with "The trial court sustained those objections."  Footnote 17 should read in its entirety:

1

Securus subsequently offered additional evidence, by way of a supplemental declaration submitted with its reply brief. Global appears to have objected to the supplemental declaration only. The trial court sustained those objections.

There is no change in the judgment. The petition for rehearing is denied.

/S/

_____

RENNER, Acting P. J.

/S/

_____

KRAUSE, J.

/S/

_____

EARL, J.

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SECURUS TECHNOLOGIES, LLC, | C095097 |
| Plaintiff and Respondent, | (Super. Ct. No. 34202180003594CUWMGDS) |
| v. | |
| DEPARTMENT OF TECHNOLOGY et al., | |
| Defendants and Appellants; | |
| GLOBAL TEL*LINK CORPORATION, | |
| Real Party in Interest and Appellant. | |

Appellants California Department of Technology (Department of Technology) and California Department of Corrections and Rehabilitation (Corrections) (together, the State) awarded a six-year contract to real party in interest and appellant Global Tel*Link Corporation (Global) to provide communications equipment and services to incarcerated persons.  Respondent Securus Technologies, LLC (Securus), an unsuccessful bidder,

1

petitioned for a writ of mandate challenging the award of the contract to Global. The trial court granted the petition and set aside the contract.

The State and Global appeal, arguing the trial court either misinterpreted a "not to exceed" (NTE) rate provision in the State's request for proposals (RFP), or should have deferred to the State's reasonable interpretation of the provision. In the alternative, the State and Global argue any variance from the RFP was inconsequential and does not justify setting aside the contract. We will reject these arguments and affirm the order granting the petition for a writ of mandate.

## I. BACKGROUND

Corrections operates correctional facilities throughout the State of California, including adult institutions, fire camps, and youth facilities. Persons incarcerated with Corrections have traditionally communicated with the outside world using conventional telephone equipment (e.g., wall-mounted phones), which allow them to make domestic and international calls across an inmate/ward telephone network.[1] An earlier contract to administer the inmate/ward telephone network was awarded to Global.[2]

More recently, Corrections has started offering more advanced forms of communications and services, such as email and inbound video clips and photos downloadable to a tablet, on a pilot basis in select institutions. According to the State, such additional forms of communication have been successfully deployed in other correctional systems around the country and have been shown to increase family and community unification.

Prompted by such potential benefits, the Department of Technology issued an RFP to solicit bids for a contract to provide communications equipment and services to

---

[1] International calls are prepaid only.

[2] That contract is not at issue here.

persons incarcerated with Corrections.[3]  The RFP sought to increase access to existing communications services and eventually provide access to new services, such as video calling.  The successful bidder would be responsible for purchasing and providing all necessary equipment (including infrastructure, hardware, and software), and providing maintenance and operational support for an initial term of six years, with options to extend the primary term to a maximum of 10 years.

A.    *The RFP Process*

The RFP was issued pursuant to Public Contract Code section 6611,[4] which authorizes the Department of General Services and the Department of Technology to use a negotiation process when contracting for information technology and telecommunications goods and services, provided certain conditions are met.[5]  (§ 6611, subd. (a).)

The RFP establishes a multi-step process for collecting and evaluating bids.  First, bidders would submit proposals describing the products and services to be provided in narrative form, and "cost workbooks" identifying the costs associated with those products and services in tabular form.  Proposals would then be scored, with each proposal receiving a maximum of 2,000 points.[6]  Bidders could receive up to 1,400 points for their technical responses, and 600 points for their cost proposals.

Second, the State would invite eligible bidders to negotiate pursuant to section 6611.  Following negotiations, the State would have the option to request that bidders

---

[3]  The Department of Technology issued addenda to the RFP in September and October 2020.  For convenience, further references to the RFP will include these addenda.

[4]  Undesignated statutory references are to the Public Contract Code.

[5]  No one suggests those conditions were not met here.

[6]  Bidders could receive additional points for incentives and preferences not relevant here.

make best and final offer submissions clarifying any negotiated items or deviations from their proposals.

Third, the State would evaluate best and final offer submissions for compliance with RFP requirements and negotiated items.  The contract would be awarded to "the value effective [best and final offer]."

B.    *The Not to Exceed "NTE" Rate*

The State determined the communications system should be revenue generating or cost neutral.  Accordingly, the RFP contemplates that cost was to be "a primary evaluation criterion weighted at 30% of the total 2,000 points."  To ensure that potential bidders kept costs top of mind, the RFP calls for an NTE rate of $.05 per minute.  To this end, the RFP provides:  "The State has established not-to-exceed (NTE) rates for this procurement.  Bidder's [*sic*] rates for calls must not exceed $.05 per minute.  Bidders may propose rates lower than the NTE identified."  (Emphasis omitted.)  The parties' dispute turns on the meaning of the word "call," as used in the NTE rate provision.

C.    *Proposals*

Three bidders submitted timely proposals, including Global and Securus.  Global and Securus presented their proposed rates using the required cost workbooks.  The cost workbooks seek rates for two general categories of communications:  telephone calls and "other offender communication[s]."

The first general category—telephone calls—is further divided into three subcategories:  (1)  "Adult – Local, IntraLATA, InterLATA, Interstate," (2) Youth – Local, IntraLATA, InterLATA, Interstate," and (3) "International Calls (Adults and Youth[)]." A glossary appended to the RFP defines the terms, "Local," "IntraLATA," "InterLATA," "Interstate," and "International."  These definitions are set forth in

4

footnote 7, below.**7**  Although the definition of "InterLATA" calls appears to include "International" calls, the parties treat "Local, IntraLATA, InterLATA [and] Interstate" calls, on the one hand, and "International" calls, on the other, as two separate and mutually exclusive subcategories.  We will do the same.  For convenience, we will refer to "Local, IntraLATA, InterLATA [and] Interstate" calls cumulatively as "domestic calls."**8**  The second general category—other offender communications—includes video calling.

Securus proposed the following rates for telephone calls:  $0.009 per minute for domestic calls by incarcerated adults, $0.00 per minute for domestic calls by incarcerated youth, and $0.05 per minute for international calls by all incarcerated persons, adults, and youth.  For video calling, Securus proposed a rate of $0.99 per transaction (i.e., per video call) rather than per minute.

Global proposed the following rates for telephone calls:  $0.025 per minute for domestic telephone calls by incarcerated adults, $0.00 per minute for domestic telephone calls by incarcerated youth, and $0.10 per minute for international calls by incarcerated adults and youth.  Global proposed a rate of $1.25 per transaction for video calls.

---

**7**  The glossary defines "Local" calls as calls "within [a] local exchange."  "An exchange is a specified area usually encompassing a city, or town and its environs."

The glossary defines "IntraLATA" calls as "Local Toll Service or Local Long Distance . . . calling within a geographic area known as a Local Access and Transport Area (LATA)."  The glossary defines "InterLATA" calls as "all calls outside the local exchange and local toll service areas," and "calls that originate in one [Local Access and Transport Area] and terminate in another and international calls."

"Interstate" calls are "calls between two states."

**8**  According to the State, "domestic telephone calls made up approximately 99% of all calls made by incarcerated people in the 8-month period ending in February 2021."

*D.     Negotiations*

The State invited Securus and Global to participate in a negotiation process.[9] During negotiations, representatives from the State informed Securus that its proposed rate for video calling ($0.99 per transaction) was high and should be expressed as a rate per minute, rather than a rate per transaction.[10] Securus explained that the proposed rate assumed a 30 minute call. The State also told Securus that the rate for video calling should comply with the NTE rate of $0.05 per minute.

The State separately negotiated with Global. At the end of the negotiations, the State asked that Securus and Global submit best and final offers.

*E.     Best and Final Offers*

Securus and Global each submitted best and final offers. For its best and final offer, Securus proposed a rate of $0.039 per minute for domestic calls by incarcerated adults, $0.00 per minute for domestic calls by incarcerated youth, and $0.039 per minute for international calls by incarcerated adults and youth. Securus proposed the same rate— $0.039 per minute—for video calling.

For its best and final offer, Global proposed a rate of $0.025 per minute for domestic calls by incarcerated adults, $0.00 per minute for domestic calls by incarcerated youth, and $0.07 per minute for international calls by incarcerated adults and youth. Global proposed a rate of $0.25 per minute for video calling.

*F.     Award*

The State evaluated and scored the best and final offers. Securus received a total best and final offer score of 1,696.71, comprised of (1) a total non-cost score of 1,312.71, (2) a total cost score of 284, and (3) an award of 100 incentive points. Global received a

---

[9] The third bidder was not invited to participate in the negotiation process.

[10] The cost workbooks specifically requested that rates for video calls be expressed on a per transaction basis.

total best and final offer score of 2,062.15, comprised of (1) a total non-cost score of 1,362.15, (2) a total cost score of 600, and (3) the same award of 100 incentive points. Corrections' evaluation and selection team recommended that the contract be awarded to Global.

The contract was awarded to Global.

## G. Trial Court Proceedings

Securus filed a petition for writ of mandate in February 2021, arguing the State should have disqualified Global for exceeding the NTE rate for international calls and video calling. The State, in response, did not deny that the NTE rate provision was a key requirement that bidders were required to meet. Nor did the State deny that awarding the contract to a nonresponsive proposal would be impermissible. Instead, the State argued—as it does here—that the NTE rate provision only applies to domestic calls. The trial court rejected the State's argument.

By then, Global had commenced performance on the contract's initial six-year term. Among other things, Global had provided tablets to incarcerated persons at one of Correction's adult facilities and was in the process of providing tablets to incarcerated persons at four other facilities.

The trial court granted the petition and set aside the contract. This appeal timely followed.

## II. DISCUSSION

## A. Standard of Review

Section 6611 authorizes aggrieved bidders to challenge an unsuccessful negotiation by way of a petition for writ of mandate pursuant to Code of Civil Procedure section 1085. (§ 6611, subd. (d).)

"Appellate review of the award of a public contract is governed by certain well-established principles. In a mandamus action arising under Code of Civil Procedure section 1085, we limit our review to an examination of the proceedings before the agency

7

to determine whether its findings and actions are supported by substantial evidence. [Citations.] 'Our review is limited to an examination of the proceedings to determine whether the [agency's] actions were arbitrary, capricious, entirely lacking in evidentiary support or inconsistent with proper procedure.' " (*MCM Const., Inc. v. City & County of San Francisco* (1998) 66 Cal.App.4th 359, 368.) In determining these issues, we defer to the public entity's factual findings when they are supported by substantial evidence. (*Id.* at p. 374.) To the extent our analysis requires us to decide questions of law, our review is de novo. (*Schram Construction, Inc. v. Regents of University of California* (2010) 187 Cal.App.4th 1040, 1052; *DeSilva Gates Construction, LP v. Department of Transportation* (2015) 242 Cal.App.4th 1409, 1420.)

B.      *Interpreting the RFP*

The State and Global argue the trial court erred in interpreting the RFP. They argue the NTE rate only applies to domestic calls and does not limit rates for international calls or video calling. We are not persuaded.

Although the RFP preceded the award and formation of the ultimate contract, we apply familiar principles of contract interpretation in ascertaining the meaning of the terms used therein. (Cf. *Banknote Corp. of America, Inc. v. United States* (Fed.Cir. 2004) 365 F.3d 1345, 1353, fn. 4 ["The principles governing interpretation of Government contracts apply with equal force to the interpretation of solicitations issued by the Government for such contracts"]; *NVT Technologies, Inc. v. United States* (Fed.Cir. 2004) 370 F.3d 1153, 1159 [applying rules of contract interpretation to construe an ambiguous solicitation provision]; *Stratos Mobile Networks USA, LLC v. United States* (Fed.Cir. 2000) 213 F.3d 1375, 1380 ["The RFP, like any contract, must be read in light of its purpose and consistently with common sense"].)

In considering the meaning of the NTE rate provision, we begin with the plain language of the RFP. (Cf. Civ. Code, §§ 1638 ["The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"]

8

and 1644 ["The words of a contract are to be understood in their ordinary and popular sense"].)  Where, as here, the parties dispute the meaning of a provision, we determine "whether the language is 'reasonably susceptible' to the interpretations urged by the parties." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 798.)  If the language is ambiguous, i.e., susceptible to more than one reasonable interpretation, the court may consider extrinsic evidence to determine the parties' intent.  (*Ibid.*; *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126.)  "When no extrinsic evidence is introduced or the extrinsic evidence was not relied on by the trial court or is not in conflict, we independently construe the contract." (*Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 980.)

We must also consider the RFP as a whole and interpret contested provisions in their context, not in isolation, with the aim of giving effect to all provisions, if doing so is reasonably possible.  (Civ. Code, § 1641 ["The whole of a contract [must] . . . be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"].)

Another principle is relevant here.  Although we review the State's interpretation of the RFP independently, "public agencies are entitled to significant deference when making interpretations that are within their particular expertise." (*Blue Cross of California v. State Department of Health Care Services* (2007) 153 Cal.App.4th 322, 330 (*Blue Cross*).)  Thus, we defer to the State's reasonable conclusions regarding technical or scientific matters within its area of expertise.  (*Ibid.*; compare *Pacific Gas & Electric Co. v. Federal Energy Regulatory Commission* (9th Cir. 1984) 746 F.2d 1383, 1387 [federal agency's interpretation was entitled to deference because it was "clearly based upon the agency's expertise in electricity transmission regulation] with *Texas Gas Transmission Corp. v. Shell Oil Co.* (1960) 363 U.S. 263, 268-270 [de novo standard of review applies to an agency's non-technical contract clause].)

9

With these principles in mind, we now turn to the language of NTE rate provision. As noted, the NTE rate provision states, in pertinent part: "Bidder's [*sic*] rates for calls must not exceed $.05 per minute." (Emphasis omitted.) The State argues the provision is ambiguous, because the RFP refers to many different kinds of "calls" but does not define the term. It is true that the RFP does not define the word "calls." However, the RFP includes a glossary, which defines other terms and phrases incorporating the word. For example, the glossary defines "[o]utbound call[s]" as "telephone, video phone, VRS [video relay service], or ASL-VCS [American Sign Language video calling services] calls originating from an [i]ncarcerated individual to their family or friends."[11] The glossary defines "[v]ideo call[s]" as "simultaneous real-time audio and video communication between [an] [i]ncarcerated individual and their family or friends." Definitions for other terms incorporating the word "call" or "calls" are set forth in footnote 13, below.[12]

---

[11] The glossary defines "[i]nbound call[s]" as "calls originating from the public to an [i]ncarcerated individual." Inbound calls are prohibited.

[12] The glossary defines a "[c]all [d]etail [r]ecord" as a "data record produced by the [communications and technology solution] that documents the details of the telephone, video phone, [video relay service], and the [American Sign Language video calling service]."

The glossary defines "[c]all [c]ontrol [f]eatures" as "variable call parameters such as calling schedule, time of day, date, or correction facility." The glossary defines "[c]all [d]etection" as a "means of detecting unusual or suspicious activities on a [communications and technology solution] call."

The glossary defines "[c]all duration" as "the total amount of minutes an [i]ncarcerated individual may converse with the called party on a [communications and technology solution] call."

The glossary defines "[c]all [f]orwarding" as "[communications and technology solution] calls forwarded by a called party to a third party."

10

We have little difficulty concluding the word "calls" includes domestic and international calls. The common and ordinary meaning of "calls" encompasses telephone communications from places near and far. (See Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 175, col. 2 [defining "call," in part, as "the act of calling on the telephone"].) Nothing in the common understanding of "calls" limits the term to "domestic calls only." Nor does anything in the RFP suggest the State intended to restrict the meaning of the term. To the contrary, the use of the plural form of "rates for calls" indicates the NTE rate provision was intended to apply to more than one type of call. We conclude the word "calls" unambiguously covers domestic and international calls.[13]

This brings us to video calling. Global argues with some force that "calls" refers to communications made by telephone. (See Merriam-Webster's Collegiate Dict., *supra*, at p. 175, col. 2.) To be sure, "calls" have traditionally been made by phone, both in correctional settings and society at large. But times change, and so too do the common and ordinary meanings of words. "Calls" can now be made from any number of devices, including cell phones, tablets, and smart watches. It should come as no surprise, then, that Merriam-Webster's Online Dictionary has updated the definition of "call" to include, "the act of speaking to or attempting to reach someone by telephone *or by a similar*

---

The glossary defines "[c]alled [p]arty" as "[i]ncarcerated individuals['] family or friend."

The glossary defines "[t]hree-[w]ay [c]alling" as "[c]alling that involves connecting three (3) distinct parties."

[13] The State argues the word "calls" should be understood to refer to domestic calls only, because the RFP was primarily concerned with costs for domestic calls, which account for the overwhelming majority of calls by incarcerated persons. That the State may have considered costs for domestic calls to be a priority does not mean the word calls can reasonably be understood to mean "domestic calls only." The State could have viewed costs for domestic calls as a priority and still intended for the NTE provision to apply to all calls.

11

*online communication servic*e." (Merriam-Webster Dict. Online (2023) <http://www.merriam-webster.com/dictionary/call> [as of March 16, 2023], archived at <https://perma.cc/AV8A-W38P> emphasis added.) Revealingly, Merriam-Webster's Online Dictionary offers both "telephone call" and "video call" as usage examples. (*Ibid.*) Under the circumstances, and considering the purpose of the RFP was to modernize communications services for incarcerated persons by providing them with tablets, we conclude the NTE rate provision unambiguously applies to all "calls," regardless of the specific technology used to make such calls.

We find support for our conclusion in *Foxcroft Productions, Inc. v. Universal City Studios, LLC* (2022) 76 Cal.App.5th 1119 (*Foxcroft*), a contract dispute between the creators of the television character "Columbo" and the studio responsible for making the series of the same name. (*Id.* at p. 1121.) The parties' dispute turned on the meaning of the word "photoplays." (*Ibid.*) The creators argued the word was ambiguous and should not include episodes of the show. (*Ibid.*) The studio countered that "photoplays" covered " 'any video recorded program,' " including episodes. (*Ibid.,* italics omitted*.*)

The trial court agreed with the studio and the Court of Appeal affirmed, stating: "The writers' argument fails because there is no ambiguity. The [agreement] often uses the word photoplay with modifiers, like 'feature-length photoplay' to refer to a movie or 'pilot photoplay' to refer to a pilot episode. When used alone, the word photoplay is broad and can mean each of these different terms." (*Foxcraft, supra,* 76 Cal.App.5th at p. 1132.) The court elaborated: "An example illustrates the point. Suppose an author contracts to write books. The contract uses the words 'fiction books,' 'fantasy books,' 'children's books,' and 'ebooks.' A term of the contract referring simply to 'books' would be broad and unambiguous. It would include all types of books." (*Ibid.*) So too here. The NTE rate provision's limitation on "rates for calls" unambiguously applies to all calls, of whatever type.

12

We conclude the RFP is not reasonably susceptible to the interpretation urged by the State and Global. Having so concluded, we need not consider whether extrinsic evidence would support an alternative interpretation.[14] (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448 [if the contract is not reasonably susceptible to the proffered construction, " 'the case is over' "].) That leaves us with their argument that we should defer to the State's interpretation of the RFP.

The State and Global rely on cases recognizing that courts may appropriately defer to agencies' reasonable interpretations of their own regulations or statutes in fields they are charged with regulating. (See, e.g., *Yamaha Corp. of America v. State Board of Equalization* (1998) 19 Cal.4th 1, 7 ["An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts"]; *Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1505 [Insurance Commissioner's interpretation of regulations entitled to deference]; see also *Akella v. Regents of University of California* (2021) 61 Cal.App.5th 801, 815-816 [university's interpretation of instructional workload policy was entitled to deference].) We have no quarrel with these authorities or the principles for which they stand. However, we question whether the rule of judicial deference applies with equal force to an agency's interpretation of a contract or similar instrument in a dispute with an outside party. (See *Scenic America, Inc. v. Department of Transportation* (2017) ___ U.S. ___ [138 S.Ct. 2, 2-3, 199 L.Ed.2d 271, 271-272] (Gorsuch, J., concurring in denial of certiorari) ["Whether *Chevron*-type deference warrants a place in the canons of contract interpretation is surely open to dispute"].)

---

[14] We have previously denied requests for judicial notice of additional extrinsic evidence by the State and Global.

13

Only *Blue Cross,* on which the State and Global extensively rely, comes close to suggesting that the State's interpretation of the RFP should receive deference.[15]  There, another panel of this court considered an RFP for contracts to provide managed health care services to members of California's Medi-Cal program in Riverside and San Bernardino counties.  (*Blue Cross, supra,* 153 Cal.App.4th at p. 324.)  The RFP required separate bid proposals for each county, with lists of providers who had contracted with the bidder to render medical services to members in the county.  (*Ibid.*)  The disappointed bidder, Molina Healthcare, submitted identical lists of providers with each proposal. (*Ibid.*)  The Department's Office of Medi-Cal Procurement (OMCP) rejected Molina Healthcare's bids as nonresponsive.  (*Ibid.*)

Molina Healthcare appealed to the Department.  (*Blue Cross, supra,* 153 Cal.App.4th at p. 324.)  A hearing officer ruled the RFP did not preclude the submission of identical, dual-county provider networks and set aside notices of intent to award the contracts to rival bidder, Blue Cross of California (Blue Cross).  (*Ibid.*)  The trial court affirmed the decision of the hearing officer, and Blue Cross appealed.  *(Ibid.)*

On appeal, the court framed the pertinent inquiry as "whether the hearing officer's interpretation of the RFP is within the agency's discretion to interpret its own RFP and whether the hearing officer correctly applied the interpretation to the undisputed facts." (*Blue Cross, supra,* 153 Cal.App.4th at p. 330.)  The court explained:  "Since the hearing officer acts for the agency, and his or her determination is final, we apply the rule that

---

[15] *Arnold v. California Exposition and State Fair* (2004) 125 Cal.App.4th 498, 507, on which Global relies, is also distinguishable.  *Arnold* involved an attempt to vacate an operator extension agreement granted by California Exposition to Capitol Racing, a harness racing concern.  The court deferred to the determination of the Department of General Services, as "an administrative agency with expertise in the state government contracting process," that the agreement was not a public contract subject to competitive bidding.  (*Ibid*.)  The court did not defer to the agency's interpretation of a disputed term in the agreement.  *Arnold* offers no real guidance here.

14

public agencies are entitled to significant deference when making interpretations that are within their particular expertise." (*Ibid*.)

The hearing officer found—and the court agreed—that nothing in the RFP prohibited the submission of the same provider network for more than one county. (*Blue Cross, supra,* 153 Cal.App.4th at p. 332.) The "critical question," then, was whether Molina Healthcare satisfied time and distance requirements for service to members within each county. (*Ibid.*) The hearing officer determined that Molina Healthcare's dual county networks could meet the RFP's time and distance requirements, and the court deferred to the hearing officer's determination.

Setting aside our questions about whether the rule of judicial deference applies to matters of contract interpretation (which have traditionally been the province of courts), we find *Blue Cross* distinguishable. There, the work of interpreting the RFP was intertwined with complex questions about the sufficiency of dual networks of primary care providers offering different types of care (e.g., routine or urgent) in different subspecialties (e.g., family practice, internal medicine, and pediatrics) and geographic locations. (*Blue Cross, supra,* 153 Cal.App.4th at pp. 324-325.) Here, by contrast, our task amounts to an exercise in garden variety contract interpretation.

Although the RFP includes numerous technical requirements, the present dispute is decidedly nontechnical in nature. We are called upon to ascertain the meaning of a single word—"calls"—in the NTE rate provision, which is concerned solely with setting "rates for calls." These terms and concepts—"rates" and "calls"—are familiar to anyone who has ever signed up for phone service (e.g., most adults) and do not implicate the State's substantive expertise. They are well within the competence of the court to decipher, at least as used here. We therefore conclude that *Blue Cross* is inapplicable, and the State's interpretation of the NTE rate provision is not entitled to deference.

To summarize, we conclude the NTE rate provision is neither ambiguous nor reasonably susceptible to the interpretations urged by the State and Global, extrinsic

15

evidence need not be considered, and the State's interpretation is not entitled to deference.  The trial court correctly concluded the NTE rate provision applies to all calls.

C.        *Discretion to Award the Contract to Global*

Global separately argues that section 6611, the State Contracting Manual (Manual), and the RFP together gave the State discretion to award the contract to Global, whether or not Global complied with the NTE rate provision.  We disagree.

Section 6611 directs the Department of General Services to establish procedures and guidelines for the negotiation process to procure telecommunications and information technology goods and services.  (§ 6611, subd. (c)(1) ["Those procedures and guidelines shall include, but not be limited to, a clear description of the methodology that will be used by the department to evaluate a bid for the procurement of goods, services, information technology, and telecommunications"].)

The Manual, in turn, provides that where, as here, negotiations are conducted from the outset of the procurement, the purchasing agency must "[u]se one of the following options to make a final award:  [¶]  (a)  Using the original criteria in the solicitation, score all proposals based on either the results of negotiations or, if applicable, the [best and final offer].  Award to the highest-ranked bidder.  [¶]  (b)  Revise the evaluation criteria based on the results of the negotiations.  Prior to final evaluation, all bidders participating in negotiations shall be informed of the revised evaluation criteria and shall have the opportunity to submit a [best and final offer] based on those criteria.  Award to the highest-ranked bidder."  (Off. of Legal Services, Dept. of Gen. Services, State Contracting Manual (April 2022) ch. 9, § 904 <https://www.dgs.ca.gov/PD/Resources/SCM/TOC/9/9-4> [as of Mar. 15, 2023], archived at <https://perma.cc/VW3Q-5SV3>.)  The Manual does not authorize the State to change the evaluation criteria for the RFP during negotiations without informing participating bidders and giving them an opportunity to submit best and final offers based on the new criteria.  (*Ibid.*)  Thus, the State could not change the scope of the NTE rate

16

provision without informing Securus and accepting a new best and final offer submission. (*Ibid.*) We reject the contention that the State had discretion to award the contract to Global, despite its failure to comply with the NTE rate provision.[16]

D.      *Global's Evidentiary Challenge*

Global additionally argues no admissible evidence supports the trial court's finding that the State held Securus to a different standard than Global. Global observes that Securus initially offered only general hearsay evidence that representatives from the State told Securus that rates for video calling were required to comply with the NTE rate provision.[17] Global does not appear to have objected to this evidence in the trial court, and we consider the issue forfeited.

E.      *Whether Global Received an Unfair Competitive Advantage*

Finally, the State and Global argue Securus failed to meet an evidentiary burden to show that Securus suffered an actual competitive disadvantage because bidding would have been different had the deviation from the RFP's requirements not occurred. The State and Global both suggest no such showing is possible because Global's cost proposal was so far superior to that of Securus. The trial court concluded, and we agree, that California case law does not impose the burdens the State and Global would assign.

The State and Global place heavy reliance on *Ghilotti Construction Co. v. City of Richmond* (1996) 45 Cal.App.4th 897 (*Ghilotti*), which involved an invitation for bids for

---

[16] Global directs our attention to provisions in the RFP giving the State discretion to change the RFP's requirements or waive deviations from the RFP. These provisions do not displace or supersede the Manual's requirements. (See generally Gov. Code, § 8547.2, subd. (c) [defining " 'improper governmental activity' " to include an activity by a state agency that violates any policy or procedure mandated by the Manual].)

[17] Securus subsequently offered additional evidence, by way of a supplemental declaration submitted with its reply brief. Global appears to have objected to the supplemental declaration only. The record does not contain a ruling on those objections.

17

a municipal road construction project. (*Id.* at p. 900.) The city's invitation for bids specified that bidders could subcontract no more than 50 percent of the contracted work. (*Ibid.*) The winning bidder submitted a bid expressing an intent to exceed that requirement. (*Id.* at p. 903.) The second lowest bidder petitioned for a writ of mandate. (*Id.* at p. 900.) The trial court denied the petition, and the court of appeal affirmed. (*Ibid.*)

The *Ghilotti* court explained: " 'A basic rule of competitive bidding is that bids must conform to specifications, and that if a bid does not so conform, it may not be accepted.' " (*Ghilotti, supra,* 45 Cal.App.4th at p. 904.) " 'However,' " the court continued, " 'it is further well established that a bid which substantially conforms to a call for bids may, though it is not strictly responsive, be accepted if the variance cannot have affected the amount of the bid or given a bidder an advantage or benefit not allowed other bidders or, in other words, if the variance is inconsequential.' " (*Ibid.*) The *Ghilotti* court concluded the deviation there was not material, because the winning bidder could have met the 50 percent requirement by buying supplies and materials itself, rather than having subcontractors buy them. (*Id.* at p. 903.) Since the winner's bid "could be brought into compliance with only slight alterations and without affecting the amount of the bid," the second lowest bidder could not show the winner had been given an unfair competitive advantage. (*Id.* at p. 907.) Accordingly, the *Ghilotti* court found that the deviation from the 50 percent requirement was inconsequential. (*Ibid.*)

In evaluating the materiality of the deviation, the *Ghilotti* court observed that "no evidence" showed the winning bidder "would have submitted a higher bid had it complied with the specification restricting the use of subcontractors." (*Ghilotti, supra,* 45 Cal.App.4th at p. 906.) However, the court did not purport to place an evidentiary burden on the second lowest bidder to make such a showing. Rather, the *Ghilotti* court explained: " 'The test for measuring whether a deviation in a bid is sufficiently material to destroy its competitive character is whether the variation affects the amount of the bid

18

by giving the bidder an advantage or benefit not enjoyed by the other bidders.' " (*Ibid*.) Thus, *Ghilotti* teaches that disappointed bidders need only show the existence of a deviation affecting bid amounts by giving the winning bidder an unfair advantage. (*Ibid.*) That showing has been sufficiently made here.

### III. DISPOSITION

The order granting the petition for writ of mandate is affirmed. Securus shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/

RENNER, Acting P. J.


We concur:


/S/

KRAUSE, J.


/S/

EARL, J.